Case Nos. 23-2522 / 23-2527

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| JESSICA GESSELE et al., <br><br> Plaintiffs–Appellees, <br> vs. <br><br> JACK IN THE BOX INC., a <br> Delaware Corporation, <br><br> Defendant–Appellant. | Case No. 23-2522 <br><br> USDC No. 3:14-cv-01092-HZ <br> District of Oregon |
| JESSICA GESSELE et al., <br><br> Plaintiffs–Cross-Appellants, <br> vs. <br><br> JACK IN THE BOX INC., a <br> Delaware Corporation, <br><br> Defendant–Cross-Appellees. | Case No. 23-2527 <br><br> USDC No. 3:14-cv-01092-HZ <br> District of Oregon |

**PLAINTIFFS' / CROSS-APPELLANTS'**
**PETITION FOR PANEL REHEARING**
**ON MEAL PERIOD CLAIMS ONLY**

Jon M. Egan    Jim W. Vogele
Jon M. Egan, PC   Jim W. Vogele, Attorney at Law
15875 Boones Ferry Rd. # 1527 812 NW 17th Avenue
Lake Oswego, OR 97035  Portland, OR 97209
(503) 697-3427    (503) 779-5415

Attorneys for Plaintiffs / Cross-Appellants

# TABLE OF CONTENTS

I. Introduction ............................................................................ 1

II. The panel affirmed the district court's rulings on plaintiffs' short meal period claims. It should revisit that disposition, given the Oregon Court of Appeals' opinion one day later in *Athena v. Pelican Brewing Co.* ............................................................................ 2

    A. The correct application of *Gafur I* and *Gafur II* requires reversal of the trial court's holding on shortened meal periods...................... 3

    B. Time spent clocked out for short meal periods is "work" for wage and hour purposes ........................................................................ 4

    C. The role of "clarifying" amendments under Oregon law .................. 7

III. Conclusion ........................................................................... 11

i

## I. Introduction

Plaintiffs file this petition seeking a panel rehearing on their short meal period claims only. Plaintiffs do not seek to revisit the panel's other holdings.

In this case, plaintiffs asserted a claim for damages resulting from defendant's failure to properly compensate them for short meal periods (*i.e.*, those less than the minimum 30 minutes required by law). The trial court (a) denied plaintiffs' motions for class certification on that claim (ER-346, ER-446, and ER-589), and (b) after a jury verdict and judgment were entered for all of the named plaintiffs on their individual meal period claims, granted defendant's renewed motion for judgment as a matter of law on those claims (ER-208). Both of those rulings rested on the trial court's interpretation of Oregon law as not requiring compensation for short meal periods prior to a 2010 amendment to Oregon Administrative Rule (OAR) 839-020-0050(2)(b). *Id.*

Plaintiffs appealed both the denial of class certification and the post-judgment dismissal of their individual meal period claims. Dkt. 32.1, First and Second Cross-Assignments of Error, respectively. The panel's disposition affirmed both orders, agreeing with the district court's interpretation of OAR 839-020-0050 as requiring compensation for short

1

meal periods only after the 2010 amendment. Dkt. 66.1 at 47, 49 (copy attached).

One day after the panel's disposition was published, the Oregon Court of Appeals published its own opinion in *Athena v. Pelican Brewing Co.*, 345 Or. App. 172, ___P.3d___ (Nov. 26, 2025) (copy attached). In that opinion, the Oregon Court of Appeals's interpretation of the adoption history of the meal period rule and its context contradicts this panel's interpretation. Specifically, *Athena* held that short meal periods are compensable work time in Oregon, and that this was the case both before and after the clarifying 2010 amendment to OAR 839-020-0050(2)(b). Plaintiffs therefore seek rehearing and reconsideration of the panel's meal period rulings.

## II. The panel affirmed the district court's rulings on plaintiffs' short meal period claims. It should revisit that disposition, given the Oregon Court of Appeals' opinion one day later in *Athena v. Pelican Brewing Co.*

The panel's reasoning in affirming the trial court's rulings on plaintiffs' short meal period claims has been contravened by subsequently issued authority. The panel should therefore reconsider its rulings on those claims. The *Athena* decision contravenes the panel's disposition in three main categories.

2

## A. The correct application of *Gafur I* and *Gafur II* requires reversal of the trial court's holding on shortened meal periods.

The panel opinion focused on a statement in *Gafur I* that the pre-2010 regulation "requires meal breaks but not *paid* meal breaks." Dkt. 66.1 at 44, citing *Gafur v. Legacy Good Samaritan Hosp. & Med. Ctr.*, 213 Or. App. 343, 348 (2007) (*Gafur I*), *rev'd in part on other grounds*, 344 Or. 525 (2008) (*Gafur II*), emphasis in original. But that statement in *Gafur I* was made in the context of a plaintiff who (a) did not receive a meal period at all, (b) was paid for all of that time, and (c) sought an *additional* 30 minutes pay. *Gafur I*, 213 Or. App. at 348. If a plaintiff works all the way through an 8-hour shift and is paid for 8 hours, then they have been paid for all time during the continuous workday—every minute from whistle to whistle. The *Gafur* plaintiff argued that they should instead be paid 8 hours plus 30 additional minutes because they did not receive a meal period. The Oregon Court of Appeals correctly rejected that argument in *Gafur I*.

Here, the context is different. A Jack in the Box worker who worked an 8-hour shift and took a 25-minute meal period was paid for only 7 hours 35 minutes, not 8 hours. That worker has *not* been paid for every minute from whistle to whistle. Thy are owed an additional 25 minutes if a short (*i.e.*, non–bona fide) meal period is compensable working time under the law. As discussed below, the *Athena* court ruled that those 25 minutes are

3

compensable, based on the reasoning and holding in *Gafur II*. *Gafur II* specifically dealt with rest periods, not meal periods. However, *Athena* applied *Gafur II*'s reasoning and extended its holding to short meal periods. The plaintiffs in our case were therefore entitled to wages for their pre-2010 short meal periods, and that interpretation applies to all of the other class members as well.

## B. Time spent clocked out for short meal periods is "work" for wage and hour purposes

The panel opinion either assumed or held that time spent clocked out for short meal periods is not time spent "working":

> JITB treated breaks as meal periods, and did not pay for them, if the employee was on break for at least 20 of the 30 minutes. Thus, JITB would pay for a lunch period cut to 18 minutes but not a lunch period reduced to 25 minutes. **Even so, JITB paid its employees for every minute they worked**. Thus, if a meal period was shortened from 30 to 25 minutes, JITB paid for **the 5 minutes worked** but not the other 25 minutes.

Dkt. 66.1 at 7 (emphasis added). The *Athena* court, however, noted that "work" is a term of art in Oregon wage-and-hour law, and that it can include periods not colloquially referred to as work, such as rest periods:

> In *Gafur v. Legacy Good Samaritan Hospital*, 344 Or. 525, 185 P.3d 446 (2008), the Supreme Court similarly concluded that ... "the text of the rule, its context, and related statutes demonstrate that 'work' is a term of art for purposes of wage and hour laws, and it includes rest breaks[,]" even though a rest break is not "work" in "colloquial parlance." *Id.* at 532, 534.

*Athena*, 345 Or. App. at 182. Thus, "even when an employee is not

4

performing their usual job duties, if that time is controlled by the employer such that an employee is unable to use that time for their own purposes, the employee is 'working' for purposes of wage and hour laws." *Id.* at 183, *citing Gafur II* at 534-35.

The *Athena* court did not rely on the language in OAR 839-020-0050(2)(b) that was added by the 2010 amendment. Instead, like *Gafur II*, *Athena* focused on the background hours-worked rules:

> For example, OAR 839-020-0042 provides that, under certain conditions, an employee who is required to be on duty for less than 24 hours "is considered to be working even though some of the employee's time is spent sleeping or in certain other activities." Similarly, under OAR 839-020-0041(3), an employee who must remain on-call on or close to the employer's premises such that "the employee cannot use the time effectively for the employee's own purposes is working" or is "working while 'on-call.' " In the same vein, with respect to rest periods, "the fact that a 10-minute rest break is too short to enable an employee to use the time effectively for his or her own purposes suggests that the employee is 'working' for purposes of wage and hour laws." *Gafur*, 344 Or. at 535. **We conclude that that reasoning applies with equal force to a shortened meal period.**

*Athena*, 345 Or. App. at 183 (emphasis added).

The hours-worked rules referenced by *Gafur II* and *Athena* remained the same both before and after the clarifying 2010 amendment to OAR 839-020-0050(2)(b).

Because the Oregon Bureau of Labor and Industries (BOLI) set 30 minutes as the minimum meal period, that suggests that 30 minutes or

5

more is long enough for an employee to use the time effectively for their own purposes. "However, if an employee receives less than a full 30 minutes, the employee does not have the same level of control over that time, and therefore, is still working for wage and hour purposes." *Id.*

Further, the *Athena* court examined the context of OAR 839-020-0050 to find that short meal periods are compensable work time—it did not rest its reasoning on the 2010 amendment language to subsection (2)(b):

> Other provisions of OAR 839-020-0050 support that interpretation and demonstrate that BOLI intended to define a shortened meal period as work time during which an employee is owed a wage. First, the rule defines a "work period" as the "period between the time the employee begins work and the time the employee ends work," which excludes the meal period "unless th[at] meal period is paid work time as provided in section (2) or (5) of this rule." OAR 839-020- 0050(11) (emphasis added). ... Section (5) provides that an employer who establishes an exemption from the minimum meal break requirement must nevertheless "provide the employee adequate *paid* periods in which to rest, consume a meal, and use the restroom[.]" OAR 839-020-0050(5)(a) (emphasis added). Additionally, an employee may waive their right to a meal period under certain conditions, and if they do, the employee must still be "provided with a reasonable opportunity to consume food during any work period of six hours or more" and the employee must be "paid for any and all meal periods during which the employee is not completely relieved of all duties." OAR 839-020-0050(8)(a)(F) - (G). Within that context, the requirement in OAR 839-020-0050(2)(b) to pay an employee for an otherwise unpaid meal break creates consistency for employees. Regardless of whether the employer is exempted, the employee has validly waived the meal period, or the employer is noncompliant with the rule, a meal period in which the employee is not completely relieved of their duties is part of the "work period" and thus, constitutes "paid work time."

6

*Athena*, 345 Or. App. at 181–82. Those other contextual rules also remained the same both before and after the clarifying 2010 amendment to subsection (2)(b).

Thus, *Athena* reached its conclusion that short meal periods are compensable by applying logic and *Gafur II*'s reasoning to the background hours-worked rules. It did not rely on the language of the clarifying 2010 amendment to OAR 839-020-0050(2)(b). Because those other sources for *Athena*'s conclusion did not change in 2010, *Athena* held that short meal periods were compensable both before and after the clarifying 2010 amendment to subsection (2)(b).

The plaintiffs in our case were therefore entitled to wages for their pre-2010 short meal periods, and that interpretation applies to all of the other class members as well.

## C. The role of "clarifying" amendments under Oregon law

The panel opinion reasoned that "Unless this new provision is superfluous, the old regulation did not require employers to pay for shortened meal breaks." Dkt. 66.1 at 43. Thus, the panel assumed that because there was an amendment, the rule must have operated differently before the amendment. It therefore focused on whether the 2010 amendment to OAR 839-020-0050(2)(b) could be applied retroactively.

7

*See, e.g.*, Dkt. 66.1 at 44 ("*Gafur I* and *Liborio* both suggest that Oregon courts did not apply §839-020-0050(2)(b) before June 2010.").

The *Athena* court, however, recognized that the 2010 amendment was a "clarifying" amendment rather than one of substantive change, and held that short meal periods were compensable both before and after the 2010 amendment. *Athena*, 345 Or. App. at 184. Thus, in keeping with Oregon precedent on "clarifying" amendments, *Athena* held that, "[t]he 2010 amendment then **did not substantively change the operation of the rule**, but rather, specifically articulated, consistent with the Supreme Court's treatment of the rest period in *Gafur,* that an employee who does not receive a full meal period is working for purposes of wage and hour law and is therefore entitled to their wage during that period." *Id.*[1] (emphasis added). Thus, there was no change to apply retroactively. The 2010

---

[1] While the *Athena* court did not rely on *Maza v. Waterford Operations, LLC*, 300 Or. App. 471, 478 (2019), its interpretation is consistent with footnote 6 in *Maza*, in which the Oregon Court of Appeals recognized that BOLI's interpretation of the meal period rule was the same both before and after the clarifying 2010 amendment. It is also consistent with this court's previous holding in *Rother v. Lupenko* that "Oregon law … entitles employees to receive compensation for breaks of less than thirty minutes," 515 F.App'x 672, 675 (9th Cir. 2013). Though *Rother* relied on different reasoning, its holding applied to violations that occurred prior to the 2010 amendment to OAR 839-020-0050(2)(b). *Compare Id.* with *Rother v. Lupenko*, No. CV 08-161-MO, 2010 WL 11579747, *3 (D. Or. Jan. 5, 2010) (noting that the complaint in that case was filed on February 7, 2008). *Athena*'s holding allows this panel to harmonize its holding with *Rother*'s, avoiding what would otherwise be a confusing intra-circuit split.

amendment was adopted to "**clarify** that, except as otherwise provided in BOLI's meal and rest periods rule, employees who are not relieved of all duties for 30 continuous minutes during their meal period must be paid for the entire 30-minute meal period." *Id.* (emphasis added); *accord*, ER-433 ("The current version of OAR 839-020-0050 became effective in June 2010, and was to **clarify** that, except as otherwise provided in the Rule, employees who are not relieved of all duties for 30 continuous minutes during their meal period must be paid for the entire 30 minute meal period.") (emphasis added); OREGON BULLETIN, July 2010, Volume 49, No. 7, p. 35, available at

https://records.sos.state.or.us/ORSOSWebDrawer/RecordView/1201036

("The rule amendments: ... (3) **Clarify** that, for 30 continuous minutes during their meal period must be paid for the entire 30-minute meal period.") (emphasis added).

That "clarification" of the short-meal-period rule is contrasted with the two other rule amendments done at the same time, which were to "conform" Oregon minimum-wage exemptions—*i.e.*, change them—to match their federal counterparts. *Id.* The fact that BOLI used both "conform" and "clarify" in the same rule amendment highlights the fact that "clarify" was meant to signal no change in the underlying substance of the law—under

Oregon law, a "clarifying" amendment signals that the amending legislature or agency does not intend to change the substantive operation of the rule, but rather to make its intended interpretation of the rule more clear for the public. *See, e.g.*, *Federal Deposit Ins. Corp. v. Burdell*, 307 Or. 285, 292 (1988) ("[T]he addition ... was merely a clarification rather than a substantive change in the law ... . The 1985 amendment did not alter defendant's contractual obligations."); *Kaiser Cement & Gypsum Corp. v. State Tax Comm'n*, 250 Or. 374, 378 (1968) ("It is a well established rule in Oregon that an amendment to an act may be resorted to for the discovery of the legislative intent in the enactment amended. Under some circumstances the amendment may be tantamount to a legislative declaration of the meaning of a statute. If the amendment follows... after controversies have arisen as to the true construction of the prior law it is entitled to great weight in interpreting the [statute]."), internal quotations and citations omitted; *Pete's Mountain Homeowners Ass'n v. Oregon Water Res. Dep't*, 236 Or. App. 507, 521 (2010) ("The fact that the legislature altered the wording of a statute does not always mean that it intended to alter the substantive effect of the statute."); *Emp. Dep't v. Clark*, 187 Or. App. 431, 437 (2003) ("In some circumstances, an amendment to a statute is tantamount to a legislative declaration of the meaning of the statute as a

10

whole because the amendment clears up uncertainties in the statute or expresses a legislative purpose that was previously unclear.").

As *Athena* recognized, BOLI's intent that the 2010 amendment to OAR 839-020-0050(2)(b) was a "clarifying" amendment means that the newly announced interpretation applies with equal force to the previous version of the rule. The plaintiffs in our case were therefore entitled to wages for their pre-2010 short meal periods, and that interpretation applies to all of the other class members as well.

## III. Conclusion

The *Athena* opinion makes clear that short meal periods constituted compensable work time in Oregon, both before and after the clarifying 2010 amendment to OAR 839-020-0050(2)(b). Plaintiffs therefore petition the panel to reconsider its opinion on the short meal period claims. The panel should reverse the district court's denial of class certification and reverse the district court's order granting Jack in the Box's renewed motion for judgment as a matter of law on those meal period claims.

11

DATED this 5th day of January, 2026

JON M. EGAN, P.C.

*s/ Jon M. Egan*

Jon M. Egan, OSB #002467
(503) 697-3427

JIM W. VOGELE, ATTORNEY AT LAW

*s/ Jim W. Vogele*

Jim W. Vogele, OSB #116366
(503) 779-5415

Attorneys for Plaintiffs /
Cross-Appellants

12

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 5, 2026.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 5th day of January, 2026

JON M. EGAN, P.C.

*s/ Jon M. Egan*

Jon M. Egan, OSB #002467
(503) 697-3427

Of Attorneys for Plaintiffs /
Cross-Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* [https://www.ca9.uscourts.gov/forms/form11instructions.pdf](https://www.ca9.uscourts.gov/forms/form11instructions.pdf)

**9th Cir. Case Number(s)** | 23-2522, 23-2527

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** | 2,699 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

◯ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/ Jon M. Egan **Date** | 01/05/2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* [forms@ca9.uscourts.gov](mailto:forms@ca9.uscourts.gov)

**Form 11** *Rev. 12/01/24*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JESSICA GESSELE; ASHLEY ORTIZ; NICOLE GESSELE; TRICIA TETRAULT; CHRISTINA MAULDIN, on behalf of themselves and all others similarly situated,<br><br>       *Plaintiffs - Appellees*,<br><br>  v.<br><br>JACK IN THE BOX INC., a Delaware Corporation,<br><br>       *Defendant - Appellant*. | No. 23-2522<br><br>D.C. No.<br>3:14-cv-01092-HZ<br><br><br><br>OPINION |
| JESSICA GESSELE; ASHLEY ORTIZ; NICOLE GESSELE; TRICIA TETRAULT; CHRISTINA MAULDIN,<br><br>       *Plaintiffs - Appellants*,<br>  v.<br><br>JACK IN THE BOX INC.,<br><br>       *Defendant - Appellee*. | No. 23-2527<br>D.C. No.<br>3:14-cv-01092-HZ |

2 GESSELE V. JACK IN THE BOX INC.

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, District Judge, Presiding

Argued and Submitted August 20, 2025
Portland, Oregon

Filed November 25, 2025

Before: CONSUELO M. CALLAHAN, MILAN D.
SMITH, JR., AND SALVADOR MENDOZA, JR., Circuit
Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Wage and Hour Claims / Oregon Law

The panel reversed in part and affirmed in part the district court's judgment in a wage-and-hour case brought by plaintiffs against their former employer, Jack in the Box (JITB), on behalf of themselves and a class of other former employees.

Plaintiffs challenged three JITB policies: JITB overdeducted its employees' wages for the Oregon Workers' Benefit Fund (WBF), JITB did not pay workers for

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

interrupted meal periods more than 20 minutes long, and JITB deducted employees' pay for non-slip shoes.

Plaintiffs prevailed on the WBF claims, and JITB defeated the unpaid break and shoe claims. JITB appealed, and plaintiffs cross-appealed.  The panel reversed the district court's judgment on the WBF and shoe claims, and remanded, and affirmed the district court's judgment on the unpaid break claims.

Addressing JITB's appeal concerning the WBF overdeductions, the panel held that the district court erred in finding, at summary judgment, that JITB's overdeductions were willful such that JITB owed penalty wages, and remanded for a trial on willfulness.  To help the district court and the parties retry the case, the panel also provided guidance on a penalty wage theory the parties call "Late Final Pay 1"—a claim for penalty wages for WBF overdeductions but not minimum wage or overtime violations—and the constitutional limits on penalty wages.

Next, the panel held that the district court did not abuse its discretion in declining to exclude the class members whose mailed notices were undeliverable, nor did the district court err in refusing to reduce the prejudgment interest for plaintiffs' alleged delays.  However, on remand, the district court will have to recalculate the prejudgment interest in light of the holding on willfulness.

Addressing plaintiffs' cross-appeal, the panel held that it had jurisdiction.  Because the district court granted JITB's Fed. R. Civ. P. 50(b) motion, the 30-day deadline of Fed. R. App. P. 4(a)(1)(A) ran from the amended judgment, and the cross-appeal was timely.

The panel rejected plaintiffs' challenges to how the district court's rulings on their unpaid break claims. First, the district court did not abuse its discretion in refusing to certify the unpaid break class. Second, the district court did not err in granting JITB's renewed motion for judgment as a matter of law on the named plaintiffs' individual claims because plaintiffs waived the theory that they could prevail individually by proving JITB breached its On-Duty Meal Policy Agreements with plaintiffs.

The panel reversed the district court's judgment on the shoe claims. The panel held that the district court erred in granting partial summary judgment to JITB on its affirmative defense that the shoe deductions were for its employees' benefit, and reversed and remanded so a jury can decide whether the shoe requirement was for the employees' benefit. The panel also remanded so the district court can reconsider whether to certify the shoe class.

**COUNSEL**

Jon M. Egan (argued), Jon M. Egan PC, Lake Oswego, Oregon; Jim W. Vogele, Jim W. Vogele, Attorney at Law, Portland, Oregon; for Plaintiffs-Appellees.

David P.R. Symes (argued), Symes Law Office LLC, Sandy, Oregon; Ian T. Maher, Douglas S. Parker, and Heather St. Clair, Ballard Spahr LLP, Portland, Oregon; for Defendant-Appellant.

## OPINION

M. SMITH, Circuit Judge:

In this wage-and-hour case, Plaintiffs sued their former employer, Defendant Jack in the Box (JITB), on behalf of themselves and a class of other former employees. The claims at issue challenge three JITB policies: JITB overdeducted its employees' wages for the Workers' Benefit Fund (WBF), did not pay workers for interrupted meal periods more than 20 minutes long, and deducted employees' pay for non-slip shoes. The district court narrowed the issues pretrial, finding at summary judgment that JITB's WBF overdeductions were willful and that the shoe deductions were for Plaintiffs' benefit. The jury resolved the remaining issues. Post-trial, the district court rejected all of Plaintiffs' shoe claims because Plaintiffs authorized the shoe deductions in writing.

Plaintiffs prevailed on the WBF claims, and JITB appeals from the judgment against it. But JITB defeated the unpaid break and shoe claims, and Plaintiffs cross-appeal from certain rulings against them. We conclude that the district court erred by rushing to summary judgment on the willfulness and benefit issues. We also conclude that the district court erred in holding that written authorization was a defense to all the shoe claims. Accordingly, we reverse the judgment on the WBF and shoe claims and remand. We affirm on the unpaid break claims.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Workers' Benefit Fund Deductions

The WBF funds itself by collecting an assessment, half from employers and half from employees. Or. Rev. Stat.

§§ 656.506(2), 656.506(3), 656.612. In 2003, the WBF gathered 3.6 cents per hour worked. Each employer deducted 1.8 cents per hour from each employee's paychecks. Then, the employer paid the state 3.6 cents per hour worked, the 1.8 cents taken from the employee plus 1.8 cents per hour out of its own coffers.

JITB processed these WBF deductions using a computer program called Lawson. At some point, JITB set up Lawson to deduct 1.8 cents per hour from all hourly employees in Oregon. In 2003, JITB used the accurate rate, and it evenly split the assessment with its employees.

Over the next few years, Oregon decreased the WBF assessment rate. JITB paid the correct, reduced amount to Oregon, but it never updated the amount deducted from employees. So, during the class period, employees paid more than half the WBF assessment:

| Year | Total paid to Oregon | Amount employees actually paid | Amount JITB actually paid | Amount each should have paid |
|---|---|---|---|---|
| 2004 | 3.4 ¢/hr | 1.8 ¢/hr | 1.6 ¢/hr | 1.7 ¢/hr |
| 2005 | 3.4 ¢/hr | 1.8 ¢/hr | 1.6 ¢/hr | 1.7 ¢/hr |
| 2006 | 3.0 ¢/hr | 1.8 ¢/hr | 1.2 ¢/hr | 1.5 ¢/hr |
| 2007 | 2.8 ¢/hr | 1.8 ¢/hr | 1.0 ¢/hr | 1.4 ¢/hr |
| 2008 | 2.8 ¢/hr | 1.8 ¢/hr | 1.0 ¢/hr | 1.4 ¢/hr |
| 2009 | 2.8 ¢/hr | 1.8 ¢/hr | 1.0 ¢/hr | 1.4 ¢/hr |
| 2010 | 2.8 ¢/hr | 1.8 ¢/hr | 1.0 ¢/hr | 1.4 ¢/hr |
| 2011 | 2.8 ¢/hr | 1.8 ¢/hr | 1.0 ¢/hr | 1.4 ¢/hr |

In February 2012, JITB discovered the error and corrected it.

## II. Unpaid Breaks

During shifts longer than six hours, JITB employees usually took unpaid 30-minute meal periods. *See* Or. Admin. R. 839-020-0050(2)(a). But when business was heavy, JITB management would recall employees before their breaks ended. JITB treated breaks as meal periods, and did not pay for them, if the employee was on break for at least 20 of the 30 minutes. Thus, JITB would pay for a lunch period cut to 18 minutes but not a lunch period reduced to 25 minutes. Even so, JITB paid its employees for every minute they worked. Thus, if a meal period was shortened from 30 to 25 minutes, JITB paid for the 5 minutes worked but not the other 25 minutes.

## III. Shoe Deductions

Before 2003, JITB did not require employees to wear a certain brand of shoes; any slip-resistant shoe sufficed. But JITB became concerned about the number of slip-and-fall incidents at its restaurants. JITB employees were injured 25% more frequently than the industry average. JITB lost more than $3 million per year to slip-and-fall claims.

To reduce these injuries, JITB decided to require employees to wear non-slip shoes from Shoes for Crews or Footstar. While picking a vendor, JITB listed each offer's pros and cons. Shoes for Crews would charge employees more than Footstar by about $2 per shoe. But Shoes for Crews also promised to pay a $2 per shoe rebate to JITB. In other words, with Shoes for Crews, the vendor would keep the same amount, but each employee would pay $2 more, and JITB would extract $2 per employee. Shoes for Crews also promised to indemnify JITB for certain injuries suffered by employees wearing its shoes; Footstar did not.

JITB decided to make employees purchase from Shoes for Crews.[1] After doing so, JITB collected more than $1 million in rebates and $295,000 in indemnities. During that period, JITB employees buying shoes could pay by authorizing paycheck deductions. If they did so, JITB would purchase the shoes directly from Shoes for Crews. JITB would deduct the price in three or four installments from the employee's later paychecks. After JITB paid Shoes for Crews, it would receive a $2 rebate.

## IV. Pretrial Proceedings

JITB employed the named Plaintiffs at its Oregon restaurants at various times. But all left JITB by March 29, 2010. By 2011, JITB sold all its Oregon restaurants to franchisees. After September 30, 2011, it did not have any Oregon employees.

Plaintiffs sued JITB several times. The suits began in August 2010. The next few years have a tortured history, with various Plaintiffs coming and going as various jurisdictional issues were litigated. In June 2014, Plaintiffs filed the operative Complaint, and the case inched ahead.

In June 2017, the district court certified classes to challenge the WBF and shoe deductions. But it required Plaintiffs to bring their unpaid break claims individually because it found their claims depended on the reason each break was shortened. The district court appointed a class administrator and authorized the administrator to mail notices to the class members. Of the 5,105 class members, notices mailed to 856 were undeliverable.

---

[1] The district court found this fact genuinely disputed. At summary judgment, that dispute must be resolved in the non-moving Plaintiffs' favor.

Eventually, the parties cross-moved for summary judgment, which the district court granted in part and denied in part. It decided three key points. First, the district court concluded that JITB's WBF overdeductions were willful. Second, it found the shoe deductions were for the employees' benefit. Third, in a footnote, it said the parties had agreed that the final paycheck claims relate only to the franchise transfer class.

Over the next two years, Plaintiffs moved twice more to certify an unpaid break class, citing a new case interpreting Oregon's meal break regulation, but the district court refused. JITB tried, initially unsuccessfully, to decertify the shoe class. But then, at the pretrial conference, the district court decertified the shoe class, ruling that the remaining shoe issues required individual proof. Yet it declined to exclude the 856 class members who did not receive mailed notices, finding they received the best notice practicable.

## V. Trial and Post-Trial Proceedings

Later that month, the case was tried by a jury. Plaintiffs presented a damages theory both parties call "Late Final Pay 1." JITB objected, contending that Plaintiffs waived this theory and citing the footnote from the summary-judgment ruling. The district court reconsidered that footnote and permitted Plaintiffs to seek Late Final Pay 1 damages.

The jury resolved the outstanding claims. First, on the WBF class claim, the jury found Plaintiffs had proven that some class members were not paid minimum wages, not paid sufficient overtime, and/or paid their final wages late due to a WBF overdeduction. The jury found JITB overdeducted by $13,468.37. For those overdeductions, the jury awarded

10                     GESSELE V. JACK IN THE BOX INC.

penalty wages of $5,307,589.60.[2]  Second, on the named Plaintiffs' shoe claims, the jury found that each authorized their shoe deductions in writing.  Thus, they recovered no statutory damages.  But the jury awarded them $21,112.80 in penalty wages, which reflected both the WBF claims and the shoe claims.  Third, the named Plaintiffs won their unpaid break claims resulting in an additional damage award.

JITB filed post-trial motions challenging the verdict. First, the district court granted JITB's motion to override the jury's verdict by excluding the penalty wages claimed for the shoe deductions.  It reduced the $21,112.80 penalty wage award to $11,500.80 to reflect only the WBF claims. Second, JITB asked the district court to reduce the penalty wages awarded to the WBF class, claiming the award violated due process.  The district court disagreed.  Third, JITB asked the district court to toll prejudgment interest, arguing that Plaintiffs unreasonably delayed the action.  The district court refused, finding it lacked discretion to do so.

The district court entered a judgment reflecting these rulings.  JITB renewed its motion for judgment as a matter of law (JMOL) on the unpaid break claims.  On August 8, 2023, the district court granted that motion, striking the unpaid break award.  On September 2, it entered an amended judgment.   JITB appealed on September 6.   Plaintiffs appealed on October 1.

---

[2] In the amended judgment, the WBF class only received $5,301,681.60 in penalty wages.  In its penalty-wage analysis, the district court said the jury had awarded roughly $6,000 more.  Because the discrepancy is not material, we use the number from the district court's analysis.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We review the following de novo: the district court's decisions on motions for summary judgment, *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021); its evaluation of "[w]hether a damages award violates due process," *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1120 (9th Cir. 2022); its "interpretation of whether prejudgment interest is permitted under [a] statute," *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1000 (9th Cir. 2023); and its decisions on renewed motions for judgment as a matter of law, *Tan Lam v. City of Los Banos*, 976 F.3d 986, 995 (9th Cir. 2020).

We review the following for abuse of discretion: the district court's "decision to reconsider an interlocutory order by another judge of the same court," *Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996); and its decisions regarding class certification, *Castillo v. Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020) (quoting *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 984 (9th Cir. 2015)).

## ANALYSIS OF JITB'S APPEAL

This appeal focuses on the WBF overdeductions. WBF contributions must be split evenly between employer and employee. *See* Or. Rev. Stat. §§ 656.506(2), 656.506(3). Because JITB made its employees pay more than their share, they can recover the amounts JITB should not have deducted. Also, if JITB overdeducted willfully, Plaintiffs can seek penalty wages. *See* Or. Rev. Stat. § 652.150(1). Although Plaintiffs must prove willfulness to succeed on any

12 GESSELE V. JACK IN THE BOX INC.

penalty wage theory, they have several such theories. The parties call one of those theories "Late Final Pay 1." Beyond the overdeductions and penalty wages, Plaintiffs can also recover prejudgment interest. *See* Or. Rev. Stat. § 82.010(1)(a). The jury awarded all these categories of damages.

JITB seeks to chip away at that award. First, it denies liability for any penalty wages because the district court erred in finding the overdeductions willful at summary judgment. Second, even if JITB owes penalty wages, it contends that Plaintiffs waived Late Final Pay 1 damages and should have been blocked from presenting that theory at trial. Third, even if JITB owes penalty wages, it contends the award exceeded constitutional limits. Fourth, moving away from penalty wages, JITB argues that the district court should not have let the jury award any damages for the class members not reached by mail. Finally, JITB says the district court should have tolled the prejudgment interest awarded to Plaintiffs; it contends the district court erred in finding it lacked discretion to do so.

We reverse the partial summary judgment against JITB and remand for a trial on willfulness. This disposes of the penalty wage award. To help the district court and the parties retry the case, we also provide some guidance on Late Final Pay 1 damages and the constitutional limits on penalty wages. We affirm on the last two issues.

## I. The district court erred in finding, at summary judgment, that JITB's overdeductions were willful.

To recover penalty wages, Plaintiffs must prove JITB "willfully fail[ed] to pay . . . wages . . . of an[] employee whose employment cease[d.]" Or. Rev. Stat. § 652.150(1). Often, a plaintiff will stumble trying to prove a defendant's

state of mind.  These Plaintiffs face an especially difficult task: to defend their summary-judgment victory, they must proffer enough evidence that no reasonable jury could credit JITB's testimony that it did not know about the overdeductions.  Plaintiffs have not met that burden.  The district court's reasoning—and Plaintiffs' arguments—do not show otherwise.

## A. Plaintiffs must prove that JITB overdeducted while fully aware of the circumstances and did not miscalculate unintentionally.

In Oregon employment law, "[a]n employer . . . willfully fails to pay wages owed at termination only if it is 'fully aware of [its] obligation to do so' but nonetheless consciously and voluntarily decides not to fulfill that obligation." *Wilson v. Smurfit Newsprint Corp.*, 197 Or. App. 648, 660 (2005) (alteration in original) (quoting *State ex rel. Nilsen v. Johnston*, 233 Or. 103, 108 (1962) (en banc)).  To be sure, "the word 'wilful,' . . . does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally." *Sabin v. Willamette-W. Corp.*, 276 Or. 1083, 1093 (1976) (quoting *Johnston*, 233 Or. at 108).  Willfulness requires "nothing more than this: [t]hat the person knows what he is doing, intends to do what he is doing, and is a free agent." *Id.* (quoting same).  But that rule incorporates two limits on willfulness.

First, "an employer does not act willfully if it . . . acts based on an innocent miscalculation that is not careless." *Wilson*, 197 Or. App. at 662–63.  Oregon courts also label

14                GESSELE V. JACK IN THE BOX INC.

these mistakes "unintentional miscalculations." *See, e.g.*, *id.* at 660; *Sabin*, 276 Or. at 1094.

Second, "an employer does not act willfully if it acts without fully knowing that the historical circumstances triggering the obligation have occurred." *Wilson*, 197 Or. App. at 662. For example, the employer must know whether "an identified employee has not received the wages he or she has earned." *Id.* at 665. "A reasonable lack of knowledge of [that] historical fact[] immunizes the employer from penalties." *Id.* "Further, not any quantum of knowledge exposes the employer to penalties"; only full awareness will do. *Id.*

Likewise, Plaintiffs must show JITB willfully *over*deducted. The statute only touches employers who "willfully fail[] to pay any wages or compensation [owed to] any employee" by violating certain statutes. Or. Rev. Stat. § 652.150(1). It does not reach employers who "reasonably believe[] that the employee cannot make a *prima facie* case that the wages are due and owing." *Wilson*, 197 Or. App. at 665. Here, Oregon employers may—indeed, must—deduct WBF contributions from employee paychecks. Or. Rev. Stat. §§ 656.506(2), 652.610(3)(a). Plaintiffs only challenge the deductions made using the old, higher rates. Only that excess could violate the wage deduction statute, and only that excess could be due and owing. Thus, we focus on that excess.

## B. A reasonable jury could find JITB did not use the old employee rate willfully.

A reasonable jury could find JITB did not know it was making excess WBF deductions. JITB proffered deposition testimony that it first learned of the error in February 2012. Plaintiffs proffered no contrary testimony. They protest that

JITB's denial is not credible, and a jury might agree. But courts cannot decide which witnesses are credible at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And if the jury credits JITB's testimony, JITB did not know any employee had unpaid wages upon leaving their jobs at JITB. After September 2011, JITB had no employees. If JITB did not learn about the mistake until 2012, it lacked the knowledge needed to willfully fail to pay anyone's final wages.

A reasonable jury could also find that lack of knowledge reasonable. At most, JITB overdeducted 0.4 cents per hour. About half the employees lost less than $2 over eight years. JITB never overdeducted more than $32 from any employee. Across all Oregon, and during the whole time JITB overdeducted, the overdeductions totaled about $22,000. JITB could have missed these minuscule sums without being careless.

A reasonable jury could find JITB was also not careless when it relied on its payroll software to handle these deductions. JITB used a computer program, called Lawson, to "figur[e] out . . . how much should be deducted from [each employee's] checks." When Oregon's WBF rate changed, JITB had to manually update the employee rate. But JITB might not have known to do so. A reasonable company might expect commercial payroll software to automatically split the WBF contributions after the total rate changed. Though Plaintiffs must prove willfulness, they presented no evidence that Lawson told JITB to manually update the employee rate. For example, they introduced no Lawson manuals or sales materials. Nor have Plaintiffs pointed out any reason JITB should not have trusted Lawson to figure out how much to deduct automatically.

Even if JITB knew to manually update the employee rate at one point, it might have forgotten without being careless. Rates changed at most once per year between 2004 and 2011—and often less frequently than that. Plaintiffs presented no evidence that anything would remind JITB to manually update the employee rate. In the interim, JITB's staff could have innocently misremembered how to respond to rate changes.

## C. The district court's reasoning fails because it does not establish that JITB had the right type of knowledge.

The district court concluded that JITB must have willfully overdeducted because JITB correctly updated the total rate paid to Oregon. Even if JITB knew to update the total rate, that does not prove it should have known to manually update the employee rate. Plaintiffs present no evidence about how the tax payments were updated. For all anyone can tell, these rates were updated by different people at different times, using different computer systems in different ways. Nothing shows that whatever JITB knew about updating the total rate extended to the employee rate. Perhaps a reasonable jury might infer knowledge about the employee rate from the total. But absent more evidence, it would not have to. Because Plaintiffs sought summary judgment, the district court erred by drawing their inference while a reasonable alternative remained.

The district court also suggested that JITB could have reviewed the employee withholding rate. But this does not show JITB should have known about its mistake. Oregon law does not impose penalty wages on unintentional miscalculations. An employer could prevent almost any innocent miscalculation by checking for it. If an employer

is willful simply because it could have double-checked, no miscalculation would be unintentional. Nor did the district court—or Plaintiffs—identify any special reason to check this deduction. At this stage, and without more, saying JITB could have checked the deductions does not justify pummeling it with penalty wages.

Finally, the district court noted that "a defendant generally must 'know the facts that make his conduct fit the definition of the offense,' even if he does not know that those facts give rise to [an offense]." *Elonis v. United States*, 575 U.S. 723, 735 (2015) (internal citation omitted) (quoting *Staples v. United States*, 511 U.S. 600, 607 n.3 (1994)). *Elonis* governs federal criminal statutes, not Oregon employment statutes. But more importantly, the maxim that "ignorance of the law is no excuse" does not help Plaintiffs. JITB's ignorance was factual, not legal. The parties dispute whether JITB should have known that it was using the outdated rate or that it needed to manually update the employee rate. These are not points of law. By applying *Elonis* to JITB's ignorance of the facts, the district court erred.

### D. Plaintiffs' other arguments fail because they ignore the burden of proof.

Plaintiffs add that they have proven willfulness because JITB cannot explain why it overdeducted. But this inverts the burden of proof. Plaintiffs must show why JITB overdeducted: they must show it acted out of willfulness. *See Wilson*, 197 Or. App. at 660. They did not meet their burden.

Nor can they rely on Oregon's statutory presumptions to close the gap. Oregon law presumes that a "person intends the ordinary consequences of a voluntary act," "takes

18                    GESSELE V. JACK IN THE BOX INC.

ordinary care of the person's own concerns," and "follow[s]" "[t]he ordinary course of business." Or. Rev. Stat. § 40.135(1)(a), (b), (m). Plaintiffs reason that, because JITB overdeducted, it must have done so willfully. This argument fails for two reasons.

First, Oregon's presumptions establish a prima facie case for the presumed fact. *See* Or. Rev. Stat. § 40.135(2) ("A statute providing that a fact . . . is prima facie evidence of another fact establishes a presumption within the meaning of this section."). Plaintiffs could survive JITB's motion for summary judgment with a prima facie case, but they must do more to obtain summary judgment for themselves. After all, "[w]hether [a] presumption has been overcome . . . is normally a question for the jury[.]" *Lynd v. Rockwell Mfg. Co.*, 276 Or. 341, 346 (1976) (en banc). Only "if the [other] evidence is sufficiently conclusive . . . that reasonable minds could not differ" can a court take a presumption's effect from the jury. *Id.*

Second, even if these presumptions were absolute, they do not prove what Plaintiffs need them to. JITB deducted from its employees' paychecks. Even if JITB intended the ordinary consequences of that deduction, a jury would not have to agree that *over*deducting is an ordinary consequence of deducting. Plaintiffs also argue that JITB exercised ordinary care and followed the ordinary course of business. But that only helps Plaintiffs if the jury assumes what Plaintiffs have yet to prove: an employer exercising ordinary care and following the ordinary course of business must have known it was using the outdated rate.

Lastly, Plaintiffs rely on *Sabin*, but that plaintiff did not try to prove willfulness at summary judgment. There, the employer promised vacation pay but reneged. 276 Or. at

1094.  The employee demanded his pay, but the employer refused.  *Id.*  After a bench trial, the trial court found the refusal willful.  *Id.* at 1085.  Though it was "a close question," the Oregon Supreme Court found enough evidence to affirm.  *Id.* at 1093–94.  Unlike in *Sabin*, we can only affirm if a reasonable trier of fact would have to, not just be able to, find willfulness.  Moreover, *Sabin* was close even though the employee demanded the missing pay.  Here, no employee told JITB about the missing pay, so Plaintiffs' claim is even weaker.  *Sabin* underscores the district court's error in finding willfulness at this point.

*                    *                         *

Even so, we remand so a jury can decide whether JITB was willful rather than granting summary judgment to JITB. JITB argues that no reasonable juror could find its overdeductions willful.  But the jury would not have to take JITB's side.  JITB admits that it received each new year's rate from Oregon.  JITB correctly updated the total rate paid to Oregon; it could have updated the employee rate too.  A jury could reasonably ask why JITB did not do so.  And it could reasonably find that the answer was carelessness. Plaintiffs' best argument is that the record is too sparse to show exactly what happened here.  That argument flounders when offered to defend the district court's analysis, but it has force against JITB's request for summary judgment.

## II. The district court did not abuse its discretion in ruling that Plaintiffs could present a Late Final Pay 1 theory.

The district court found Plaintiffs waived the Late Final Pay 1 theory, then reconsidered, and rightly so.  We first unravel the procedural history and then address JITB's three challenges to the district court's reconsideration.

### A. Plaintiffs did not forswear Late Final Pay 1 damages, and the district court read Plaintiffs' briefing wrong before getting it right.

When an Oregon employer pays less than it owes in an employee's final paycheck, the employer owes penalty wages. *See* Or. Rev. Stat. § 652.150. Some employees here claim penalty wages for WBF overdeductions but not minimum wage or overtime violations. Those employees employ a theory the parties call "Late Final Pay 1."

At summary judgment, Plaintiffs told the district court that their "case [was] not one that s[ought] a derivative final-paycheck penalty solely for nonpayment of wages during employment." They "ha[d] a final-paycheck class that s[ought] penalty wages for the straightforward late payment of the final paycheck upon franchization," which they do not raise here. Unlike Plaintiffs' other claims, "[t]hat violation applies to the final paycheck only and does not rely on any previous violation of any statute during employment."

Plaintiffs did not disclaim the Late Final Pay 1 theory. Late Final Pay 1 damages trace back to amounts unpaid because of WBF overdeductions. Thus, they come from a previous violation of a statute during the claimant's employment. By the same token, these damages are not based solely on nonpayment of wages.

At first, the district court found that Plaintiffs had disavowed these damages. Judge Brown noted that "[t]he parties agree Plaintiffs' final-paycheck claim relates only to the Franchise Transfer Class and is 'not derivative or duplicative of Plaintiffs' other claims.'" She surmised that "[t]he final-paycheck claim, therefore is 'excluded from [Defendant's] arguments about prohibiting multiple penalties.'"

Later, Judge Brown took senior status, and Judge Hernández took over the case. Judge Hernández was presiding when, at trial, Plaintiffs requested Late Final Pay 1 damages.

In response, he changed the previous decision about Late Final Pay 1. He acknowledged that Judge Brown "conclude[d] that [Plaintiffs] had surrendered that claim." But he found it "clear that in some of the documents that were submitted by plaintiffs, that they intended to continue with pursuing the claim[.]" He also found that JITB would not be prejudiced if Plaintiffs could present the Late Final Pay 1 theory. After taking "into consideration what [he] believe[d] was simply a mistake in Judge Brown's understanding," he found "justice . . . require[d] that [he] allow the plaintiffs to proceed on this particular issue." JITB raises three challenges to that ruling and each one fails.

## B. The district court did not sit as an appellate court.

"[O]ne judge of a district court [may not] rule directly on the legality of another district judge's judicial acts or . . . deny another district judge his or her lawful jurisdiction." *In re McBryde*, 117 F.3d 208, 225 n.11 (5th Cir. 1997) (quoting *Dhalluin v. McKibben*, 682 F. Supp. 1096, 1097 (D. Nev. 1988)). So "a chief judge" cannot "reassign[] . . . a pending case . . . without the consent of the presiding judge." *Id.* at 225. But "interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge." *Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996), *as amended* (Jan. 15, 1997) (quoting *In re United States*, 733 F.2d 10, 13 (2d Cir. 1984)).

That is what happened here. Judge Brown oversaw this case before taking senior status. Judge Hernández had the authority to modify Judge Brown's rulings without performing appellate review after the case was reassigned to him.

## C. The district court did not abuse its discretion in reconsidering the prior ruling that Plaintiffs disavowed the Late Final Pay 1 theory.

A district court may reconsider a prior decision if, among other things, it "committed clear error or the initial decision was manifestly unjust." *Sch. Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

Here, the district court did not abuse its discretion in finding clear error. Judge Hernández did not just find Judge Brown erred. He found it "clear" that the Plaintiffs "intended to continue with pursuing the claim" here. This was correct: Plaintiffs did not disclaim this theory. *See supra* Section II.A. JITB responds that Judge Hernández "underst[ood] why [the previous judge] reached [the opposite] conclusion." But understanding why an error was made does not mean the error was not clear.

Because clear error is sufficient to justify reconsideration, we need not decide whether reconsideration also avoided manifest injustice.

## D. Judicial estoppel does not change the analysis.

JITB forfeited its judicial-estoppel argument. Their previous briefing on the Late Final Pay 1 damages does not mention judicial estoppel. JITB cannot blame the district court for failing to consider a doctrine it never invoked.

Also, "the application of judicial estoppel is discretionary." *United States v. Paulson*, 68 F.4th 528, 547 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1029 (2024), and *cert. denied sub nom. Pickens v. United States*, 144 S. Ct. 1030 (2024). JITB's argument ticks through judicial estoppel's elements. Yet it does not identify any abuse of discretion. Even if JITB had preserved its argument, it would fail.

## III. The district court erred in analyzing the statutory penalty wages.

"[A]ggregated statutory damages awards are, in certain extreme circumstances, subject to constitutional due process limitations." *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1121 (9th Cir. 2022). But "damages awarded pursuant to a statute violate due process only if the award is 'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'" *Id.* at 1120 (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919)).

Courts consider several sets of factors in applying this standard. For one thing, "a court must evaluate an award of statutory damages 'with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence' to the statute." *Id.* (quoting same). Also, the following "factors . . . help assess proportionality and reasonableness": "1) the amount of award to each plaintiff, 2) the total award, 3) the nature and persistence of the violations, 4) the extent of the defendant's culpability, 5) damage awards in similar cases, 6) the substantive or technical nature of the violations, and 7) the circumstances of each case." *Id.* at 1123 (quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1309 (9th Cir. 1990)).

After retrial, if a jury finds JITB willfully overdeducted, the district court will have to reassess the constitutional limits on any penalty-wage award. Because the record is in flux, we will not specify the outer limit on such an award. But the record is developed enough for us to note two errors in the district court's prior analysis.

### A. The district court erred by failing to consider that penalty wages penalize defendants, not compensate plaintiffs.

"Where a statute's compensation and deterrence goals are . . . greatly overshadowed by punitive elements, constitutional due process limitations are more likely to apply." *Wakefield*, 51 F.4th at 1122. "Legislatures are empowered to prescribe purely punitive penalties for violations of statutes." *Id.* at 1123. So "just because an aggregate award becomes predominantly punitive does not render it constitutionally unsound." *Id.* at 1124. But "a district court must consider the magnitude of the aggregated award in relation to the statute's goals of compensation, deterrence, and punishment and to the proscribed conduct." *Id.* at 1123.

Here, the district court ignored that Oregon's penalty wages are penal. "Penalty wages are designed 'to spur an employer to the payment of wages when they are due' and are punitive, not compensatory, in nature." *N. Marion Sch. Dist. No. 15 v. Acstar Ins. Co.*, 343 Or. 305, 316 (2007) (en banc) (quoting *Nordling v. Johnston*, 205 Or. 315, 326 (1955)). "Compensation to the employee is merely

incidental."[3]  *Nordling*, 205 Or. at 326 (calling penalty wages "penal in character").  JITB pointed that out to the district court.  But the district court never touched on this factor.

On remand, if penalty wages are awarded, the district court must consider this factor, and it must analyze the public interest and uniform adherence factors consistent with what Oregon has said about the purpose of penalty wages.

## B. The district court erred by refusing to consider the ratio between statutory and actual damages.

The ratio between statutory and actual damages matters. "Although we [have] decline[d] to apply the Supreme Court's tests developed" for punitive damages to statutory damages, those tests still "teach" "by analogy" how to analyze "statutory damages [that] no longer serve purely compensatory or deterrence goals." *Wakefield*, 51 F.4th at 1122–23.  For example, *Wakefield* relied on the Supreme Court's discussion of "the 'ratio' between a punitive damages award and the 'actual harm inflicted on the plaintiff' as measured through compensatory damages." *Id.* at 1123 (citation omitted).  *Wakefield* did not hold that ratio has the same meaning in the statutory damages context.  But it cited that ratio while describing how punitive and statutory damages were analogous.  That would be jarring unless the ratio between the award and the injury affected statutory damages too.

The rest of *Wakefield* confirms this intuition.  It repeatedly instructed district courts to consider the "award's

---

[3] Plaintiffs cite *State ex rel. Nilsen v. Or. State Motor Ass'n*, 248 Or. 133, 138 (1967), but it does not say whether penalty wages punish.  Plaintiffs cite no Oregon court saying penalty wages deter rather than punish.

. . . proportionality to the violation and injury[.]" *See, e.g.*, *id.* One cannot tell whether two things are proportional without evaluating the proportion, or ratio, between them. In some cases, the actual damages may not be available or may not be a good proxy of the injury. But when a district court knows the actual damages, and that amount measures the injury well, it cannot blind itself to the ratio between that amount and the award.

The district court did exactly that here. The parties presented evidence on actual damages. Because Plaintiffs claim unpaid wages, their injuries are purely economic. The amount of the overdeductions mirrors the extent of the injury. Even so, the district court found "that the constitutionality of a statutorily prescribed penalty is generally not to be evaluated by its ratio to the damages suffered by the plaintiff." On these facts, it erred.

That ratio, if considered, should have raised eyebrows. The award was based on overdeductions of $13,468.37.[4] But the penalty wages were $5,307,589.60. The penalty was nearly 400 times greater than the injury.

Because the district court ignored that disparity, it improperly evaluated the class members' award, total award, and the awards in similar cases. None of these factors can be assessed in isolation. A given sum may be proportionate to one injury but disproportionate to another. Thus, the class members' award and total award may cut differently depending on the injury suffered. Likewise, two cases are not similar unless the injuries at issue are comparable. On

---

[4] The WBF overdeductions totaled $21,945.29. But many deductions fell outside the statute of limitations, so the district court computed penalty wages for $13,468.37 in overdeductions.

remand, if penalty wages are awarded, the district court must evaluate these factors with an eye to Plaintiffs' actual damages.

## IV. The district court did not abuse its discretion in declining to exclude the class members whose mailed notices were undeliverable.

"For any class certified under Rule 23(b)(3) . . . the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

JITB argues that the class members did not receive the best notice practicable because "no other efforts to reach class members were employed when [17%] of them received no notice." JITB wants to exclude those whose notices were undeliverable.

JITB has not shown that the district court provided inadequate notice. Neither JITB's appellate briefing nor its trial briefing identifies any other step the district court could have taken to contact class members.

For that reason, JITB cannot rely on *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035 (9th Cir. 2019). *Roes* found "there were numerous other reasonable options that could have been pursued to improve the notice process[.]" 944 F.3d at 1047. For example, e-mail notice might work. *Id.* Even if that was infeasible, "electronic[] disseminat[ion] through social media or postings on any relevant online message boards" could work. *Id.* In *Roes*, the class members were exotic dancers that congregated on sites like StripperWeb.com and on social media, where they could be reached by posts and targeted ads. *Id.* at 1039, 1047. Here,

JITB has not argued that it has the class members' e-mails, identified online fora where they gather, or proposed any strategy for reaching them on social media. Also, we were troubled in *Roes* "that it might be difficult to reach the class members because of their 'transient' nature." *Id.* at 1046. But nothing shows former JITB employees wander nomadically. *Roes* does not show the district court gave inadequate notice.

Nor did the district court abuse its discretion by including those whose notices were undeliverable. "[N]either Rule 23 nor the Due Process Clause requires actual notice to each individual class member." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017). Even more so when the district court's risk of "deny[ing] an absent class member the opportunity to opt out and pursue individual litigation" is "virtually nonexistent[.]" *Id.* at 1129. At least once, we have affirmed when a district court included class members whose notices were undeliverable and never remailed. *See Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010). At least here, where nothing suggests class members want to pursue individual litigation, and the parties offered no ready way to reach more class members, it did not abuse its discretion by including those unreached by mail.

Including these class members did not prejudice JITB either. JITB argues that it will have to pay a jury award calculated based on the entire class, even though the administrator notified only 83% of the class. But JITB never cites record evidence that the money it owes to the 17% whose mailings were undeliverable will be paid to the 83% whose mailings were deliverable. Besides, JITB never aired this possible windfall while moving for decertification. The

district court could not consider prejudice that JITB did not raise.

## V.  The district court did not err in refusing to reduce the prejudgment interest for Plaintiffs' alleged delays.

Plaintiffs requested prejudgment interest on the jury's award.  JITB responded that the prejudgment interest should be reduced because Plaintiffs delayed the case.  It blames Plaintiffs for filibustering two periods of the case and argues Plaintiffs should get no interest for those times.  The district court found that it had no authority to reduce prejudgment interest, even for delays caused by Plaintiffs.  Both parties agree that no Oregon court has decided whether that authority exists.  We find that the district court was correct.

For starters, the relevant statute's text creates no discretion to reduce prejudgment interest for delays.  That statute mandates prejudgment interest on "[a]ll moneys after they become due[.]"  Or. Rev. Stat. § 82.010(1)(a).  As a result, "prejudgment interest . . . is not a matter of judicial discretion, but is required by" the statute.  *Wilson v. Smurfit Newsprint Corp.*, 197 Or. App. 648, 673 (2005) (quoting *State Highway Comm'n v. DeLong Corp.*, 275 Or. 351, 357 n.2 (1976) (en banc)).  At least by November 1, 2011, Plaintiffs' unpaid wages were due.  If the district court had reduced the prejudgment interest after that, Plaintiffs would not have received interest on all their money for all the time it was due.  This result cannot be squared with the statute's text.

To be sure, "[t]hat uncompromising language . . . has long been subject to a judicial gloss." *Id.*  But that gloss does not support JITB either.  As Oregon courts interpret the statute, "a party can receive prejudgment interest only when the exact pecuniary amount was either ascertained, or

ascertainable by simple computation, or by reference to generally recognized standards such as market price, and where the time from which interest must run can be ascertained." *Id.* (cleaned up) (quoting *Pub. Mkt. Co. v. City of Portland*, 171 Or. 522, 625 (1943)).  Here, Plaintiffs argue that JITB overdeducted from their paychecks.  They claimed damages for the excess, so the damages were ascertainable by simple computation.  The penalty wages were fixed by statute and just as easily calculated.  *See* Or. Rev. Stat. § 652.150(1).  The time from which interest runs is equally clear: the parties stipulated to October 31, 2011.  Though *Wilson*'s gloss halts unascertainable prejudgment interest, that gloss changes nothing here.

Though prejudgment interest depends on ascertainability, JITB's position would make prejudgment interest less ascertainable.  A court can easily administer Plaintiffs' proposed rule: it finds the first date the damages can be ascertained and applies prejudgment interest from there.  But JITB urged the district court to divvy the case into periods that were delayed by Plaintiffs and periods that were not.  To do so, JITB asked the district court to find two of Plaintiffs' arguments unreasonable—its joint employer theory and efforts to certify an unpaid break class.  In other cases, defendants would not have to stop where JITB did.  District courts—and our court—could be called upon to parse future plaintiffs' litigation choices at a microscopic level.  If parties can rehash each stage of the case, they may drown the courts in extra work.

JITB's rule also clashes with the statute's purpose.  "In general, such interest is awarded to fully compensate a judgment creditor for a prejudgment loss of the use of money or property that otherwise would go unremedied."  *Chase v. Chase*, 354 Or. 776, 784 (2014) (en banc).  Even if Plaintiffs'

counsel should have prosecuted the case more quickly, JITB still held Plaintiffs' money during that delay. Plaintiffs could not have used their money, and JITB could have used, earned interest on, or invested that money. Plaintiffs will not be fully compensated unless they receive interest for the entire time JITB kept their money.

JITB's best response is that other states have held that, though prejudgment interest is not discretionary, it may still be tolled for delays caused by the plaintiff. That rule holds in at least Florida, Delaware, and Washington. *See Moskowitz v. Mayor & Council of Wilmington*, 391 A.2d 209, 210–11 (Del. 1978) (holding that "[i]nterest is awarded in Delaware as a matter of right and not of judicial discretion" but that "[a] . . . factor affecting the computation of interest is whether the plaintiff has been guilty of delay in pursuing his claim"); *Colonial Imports v. Carlton Nw., Inc.*, 83 Wash. App. 229, 245 (1996) (noting that "prejudgment interest [i]s a matter of right where the claim is liquidated," but "find[ing] nothing . . . which would cause us to conclude that the right is necessarily absolute, regardless of delay attributable to the claimant"); *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985) (finding that Florida courts "do[] not have discretion" in applying prejudgment interest); *State v. Fam. Bank of Hallandale*, 623 So. 2d 474, 480 (Fla. 1993) ("denying an award of prejudgment interest" because the interest awarded would "include[] interest for periods of delay caused by" the plaintiff).

But at least two states have rejected this logic. In New York, "prejudgment interest only compensates the judgment creditor for the loss of use of money he or she was owed and is not a penalty," so "the 'responsibility for the delay [in bringing suit] should not be the controlling factor in deciding

32          GESSELE V. JACK IN THE BOX INC.

whether interest is to be computed.'" *O'Keefe v. Barra*, 186 N.Y.S.3d 717, 720–21 (App. Div. 2023) (alteration in original) (quoting *Love v. New York*, 78 N.Y.2d 540, 544 (1991)). "Rather, what is dispositive on this point is when the plaintiff's right to be compensated for the damages he or she sustained becomes fixed in law." *Love*, 78 N.Y.2d at 544. Likewise, in Ohio, "a prejudgment interest award begins to run on the date the cause of action accrued" and "a trial court may not adjust the date the award begins to run for equitable reasons." *Musisca v. Massillon Cmty. Hosp.*, 635 N.E.2d 358, 360 (Ohio 1994).

We hold that the reasoning of the decisions of the states favoring Plaintiffs is more persuasive. Like Oregon, New York focuses on fully compensating plaintiffs who lost use of their money and awards prejudgment interest whenever damages can be fixed. Although Florida, Delaware, and Washington take after Oregon in that prejudgment interest is not discretionary, none of these states spoke to the other two points that persuaded New York.

We therefore affirm the district court's analysis. However, the district court will have to recalculate the prejudgment interest in light of our holding on willfulness. We remand for that reason.

### ANALYSIS OF PLAINTIFFS' CROSS-APPEAL

This cross-appeal begins with a jurisdictional challenge. Because the cross-appeal was timely, we reach the merits. The merits split into two parts.

First, Plaintiffs contest how the district court handled the unpaid break claims. The district court did not certify an unpaid break class because Plaintiffs could not prove their claims class wide. We agree with Plaintiffs that this

reasoning breaks down. But later, the district court offered another reason the class claim could not proceed. That was correct, so we ultimately affirm. Next, Plaintiffs claim the district court erred in granting JITB's renewed motion for JMOL on their individual claims. They argue that, even if the class claims fail, they could prevail individually by proving JITB breached its On-Duty Meal Policy Agreements with the Plaintiffs. Because Plaintiffs waived this theory, they cannot rely on it now. We affirm here too.

But we reverse on the shoe claims. JITB could only deduct from its employees' wages for the shoes if permitted by statute. The provision they cite only applies if the shoes benefited the employees. The district court decided that JITB had established that fact at summary judgment, but it erred. A reasonable jury would not have to find that the shoes benefited Plaintiffs. Next, the district court decertified the shoe class. It did so because it thought JITB had established the shoes were for the employees' benefit and the remaining issues required individual proof. Because the district court erred at summary judgment, we remand so the district court can reconsider. Finally, after trial, the district court held that, because the shoes were for the employees' benefit, JITB could count the shoes' cost towards the minimum wage and overtime. It reduced the jury's award accordingly. Oregon law does not allow that. In sum, we reverse JITB's victory on the shoe claims. On remand, the district court should (1) reconsider whether to certify a shoe class given our decision; (2) retry the shoe claims (on a class or individual basis) to see if the shoes were for the employees' benefit; and (3) resolve any other issues consistent with our decision.

34                GESSELE V. JACK IN THE BOX INC.

## VI.   We have jurisdiction over Plaintiffs' cross-appeal.

JITB attacks the cross-appeal as untimely.  After the district court entered judgment, JITB moved under Fed. R. Civ. P. 50(b) on the unpaid break claims.  On August 8, 2023, the district court granted that motion.  It entered an amended judgment on September 2.  Plaintiffs appealed on October 1, less than 30 days after the amended judgment but more than 30 days after the order granting JITB's motion. Thus, this cross-appeal is timely only if the 30-day appeal deadline runs from the amended judgment, not the order.

Generally, "[i]n a civil case . . . the notice of appeal . . . must be filed . . . within 30 days after entry of the judgment or order appealed from."  Fed. R. App. P. 4(a)(1)(A).  "If a party files," among other things, a motion "for judgment under Rule 50(b)" or a motion "to alter or amend the judgment under Rule 59," "the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion."  Fed. R. App. P. 4(a)(4)(A).  "A party intending to challenge an order disposing of [those motions], or a judgment's alteration or amendment upon such a motion, must file a notice of appeal . . . within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion."  Fed. R. App. P. 4(a)(4)(B)(ii).

"Read literally, the rule applies" so that "[t]he appeal . . . expire[s]" 30 days after an order ruling on a Rule 50 or 59 motion.  *S. Union Co. v. Sw. Gas Corp.*, 415 F.3d 1001, 1004 (9th Cir. 2005), *opinion amended on denial of reh'g*, 423 F.3d 1117 (9th Cir. 2005).  But we have declined to "read [this] rule to mean Appeal first, Judgment afterwards."  *Id.* Thus, when a district court grants a Rule 50 or 59 motion, and later amends the judgment, the appeal deadline runs

from the amended judgment.[5]  *See id.*; *accord Resol. Tr. Corp. v. Keating*, 186 F.3d 1110, 1114 (9th Cir. 1999).

Not so when the Rule 50 or 59 motion is denied. "[W]hen a district court properly enters an order . . . denying a party's Rule 59 motion for a new trial, it is not required to enter a separate document labeled 'judgment' to start the 30–day period for the filing of a notice of appeal." *Webb v. Ada County*, 285 F.3d 829, 836 (9th Cir. 2002) (distinguishing *Hollywood v. City of Santa Maria*, 886 F.2d 1228, 1231–32 (9th Cir. 1989)).  As such, "the 30–day period begins to run when the district court enters a final order denying a Rule 59 motion." *Id.*

But here, as in *Webb*, "the district court did not simply deny" the post-trial motion.  285 F.3d at 836.  Instead, in both cases, "the district court [granted the motion and] ordered the parties to submit a final judgment for the court's approval" a few days later.  *Id.*  So, like the appellant in *Webb*, Plaintiffs "timely filed [their] appeal because the 30–day period began to run when the court filed its amended judgment[.]" *Id.*

JITB tries to distinguish those cases because the post-trial motions were filed pursuant to Fed. R. Civ. P. 59, not 50(b).  But that makes no difference.  Fed. R. App. P. 4 treats both motions the same.  It creates special rules for the listed post-trial motions, and Rule 50(b) and 59 motions are on the same list.  Fed. R. App. P. 4(a)(4)(A).  To JITB, Rule 59(e) motions stand apart because they seek an amended

---

[5] JITB argues *S. Union* differs because that appellant did not have anything to appeal before the amended judgment.  But that is not true.  If JITB were right, the appellant could have appealed the order ruling on the motion for a new trial—which issued before the amended judgment. *See* 415 F.3d at 1003–04.

judgment. Yet a Rule 50(b) motion is the same. When, as here, that motion was filed post-judgment, it seeks an amended judgment.

Because the district court granted JITB's Rule 50(b) motion, the 30-day deadline ran from the amended judgment, and the cross-appeal is timely.[6]

## VII. The district court did not abuse its discretion in refusing to certify the unpaid break class.

The parties' dispute turns on two separate questions: whether an employer is always liable when it cuts meal breaks short, and if liable, whether the remedy is wages for the length of the shortened break.

Today, courts answer both questions yes, but JITB says that changed. While at JITB, Plaintiffs received shortened meal breaks. They left JITB before June 2010. In that month, Oregon amended its meal break regulation, adding that employers must pay for shortened breaks. Plaintiffs sued, claiming JITB should have paid for the shortened breaks no matter what. The district court declined to certify an unpaid break class: it did not decide whether Plaintiffs could claim unpaid wages, but it ruled the class's claims turned on the reasons each meal break was shortened. In 2019, in *Maza v. Waterford Operations, LLC*, 300 Or. App. 471 (2019), the Oregon Court of Appeals held that those reasons did not matter, and it held that Oregon employers had to pay for shortened meal breaks. *See id.* at 480. The district court held that *Maza* did not apply before 2019 or at least not before June 2010. At that time, it decided the issue

---

[6] We deny the motion to supplement the record. The materials in the motion do not help resolve whether the cross-appeal is timely.

ignored before: it held that Plaintiffs could not claim unpaid wages for shortened breaks before June 2010.

We must decide two points.  First, whether the reason for each shortened break matters.  *Maza* held it did not, and that part applied before 2010.  Second, whether Plaintiffs can claim unpaid wages.  *Maza* held they could, but that part applies only after June 2010.  We affirm for that reason.

## A. The district court's original reason for refusing to certify the class contravenes *Maza*.

At all relevant times, Oregon required that "every employer shall provide to each employee, for each work period of not less than six or more than eight hours, a meal period of not less than 30 continuous minutes during which the employee is relieved of all duties."[7]  Or. Admin. R. 839-020-0050(2)(a) (2009).

Plaintiffs claim JITB violated this regulation by calling employees back to work during their 30-minute meal periods.  Though JITB did not have to pay employees for full meal breaks, Plaintiffs claim JITB should have paid for these shortened meal breaks.

The district court refused to certify a class to bring these claims because the claims required an "individualized inquiry [that] exceed[ed] the common class questions [so that] resolution of the unpaid break claims [was] not amenable to efficient classwide resolution."  "[T]here were various reasons why [the plaintiffs] may have taken breaks

---

[7] Or. Admin. R. 839-020-0050 underwent several changes over the last couple decades.  Though JITB argues that the rule changed substantially in June 2010, neither party argues that any other change mattered.  Accordingly, we rely on the 2009 version for the period before June 2010 and the 2011 version for the period thereafter.

38                    GESSELE V. JACK IN THE BOX INC.

between 20 and 30 minutes." And "for each break between 20 and 30 minutes the fact-finder must examine the reason the employee clocked back in between 20 and 30 minutes to determine whether the break at issue was a shortened meal break[.]" Some shortened breaks occurred because employees "would occasionally return voluntarily . . . because the restaurant was 'swamped,'" but others occurred because "occasionally [some] manager[s] asked [employees] to return . . . before 30 minutes." Throughout, the district court focused on each shortened break's reason.

Later, the Oregon Court of Appeals forbade courts from considering those reasons. "[I]f, for whatever reason, an employee takes a shorter meal period, then . . . wages must be paid for the entire meal period."**[8]** *Maza*, 300 Or. App. at 476. This resembles "strict liability." *Id.* Put differently, the regulation "requires employees to actually take a 30-minute meal period, and . . . it is the employer's responsibility to enforce that requirement[.]" *Id.* at 477. Because employers must enforce meal breaks, whether the employees voluntarily returned or were ordered to return does not matter. To the extent *Maza* applies here, the district court abused its discretion by relying on that distinction.

The district court—and JITB—attempt to duck *Maza* for three reasons, but only the last persuades.[9]

---

[8] This quote, and the two that follow, describe the plaintiffs' position in *Maza*. *See* 300 Or. App. at 476–77. They also reflect *Maza*'s holding because *Maza* closed this discussion by saying, "We agree with plaintiffs[.]" *Id.* at 477.

[9] In their reply brief, Plaintiffs advance another theory: that JITB also violated the regulation because Plaintiffs were "'on call' during their meal periods" because they were "subject to being called back to duty[.]" We do not reach that issue because Plaintiffs waived it twice over. As

### B.    *Maza* governs meal breaks that occurred before *Maza* was decided.

JITB argues—and the district court found—that *Maza* applies only prospectively.  That is, they contend *Maza* applies only to meal breaks after 2019.  Because JITB had no employees after that date, the district court stood by its refusal to certify this class.  But *Maza* cannot run purely prospectively because it interpreted a regulation.

When the Oregon Supreme Court adopts "*a rule of its own making*," it sometimes gives "only prospective effect" to that rule.  *Halperin v. Pitts*, 352 Or. 482, 497 (2012).  But it has not issued purely prospective decisions outside that context.  And it has specifically denied that it has "discretion to give such limited effect to its interpretation of a legislative enactment."  *Id.*; *see Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1132 n.5 (9th Cir. 2021) ("When Oregon courts interpret statutes, they apply a newly announced interpretation of a statute retrospectively to the dispute that prompted it.").  It lacks that discretion because "[t]he exercise of judicial discretion to apply interpretations of statutes only prospectively may raise significant constitutional issues concerning justiciability, equal treatment, and separation of powers."  *Halperin*, 352 Or. at 497 n.4.

No case deals with purely prospective regulatory interpretation, but the outcome is the same.  Such interpretations raise the concerns from *Halperin*.  When a court interprets a regulation or statute purely prospectively,

---

the district court noted, Plaintiffs never argued below "that Plaintiffs worked continuously or were on call during their meal periods."  Even if we excused that waiver, Plaintiffs should have raised this theory in their opening brief.  They did not.

it cannot affect the parties before it, whose claims arose before its interpretation. In both cases, the parties are not truly adversaries, and the court arguably issues an advisory opinion. And like interpreting statutes prospectively, interpreting regulations prospectively treats parties unequally. Those violating the regulation after the interpretation must contend with—or may exploit—the interpretation, but those who violate it before may not. This is true even though no agency changed the regulation (or no legislature amended the statute). For that reason, separation of powers cuts against pure prospectivity: construing regulations prospectively interferes with the executive as much as construing statutes prospectively interferes with the legislature.

JITB argues that Oregon courts do have discretion to interpret "a statute or regulation prospectively to prevent detriment to those who justifiably relied on overruled precedent." But the case it cites does not support that. There, an Oregon intermediate appellate court "assume[d]" without deciding that "courts can refuse to apply a decision retroactively that changes a previous construction of a statute." *U.S. Nat. Bank v. Wagoner*, 71 Or. App. 266, 269 (1984) (emphasis omitted). Even if *Wagoner* had construed a statute purely prospectively, it would be trumped by *Halperin*, a higher court's later decision.

JITB also argues that "[t]he substantive rights and liabilities of persons affected by an event are defined by the law in effect at the time of the event." *Antonnaci v. Davis*, 108 Or. App. 693, 695 (1991). But interpreting the regulation purely prospectively would undercut, not uphold, this principle. The substantive law here is the Oregon meal break regulation. *Maza* did not change that regulation; it simply interpreted it. The regulation operated both before

and after *Maza*. JITB's liability should align before and after *Maza*. But if JITB were right, only meal breaks after *Maza* would be subject to its holding. *Maza* must therefore run retroactively.

### C. *Maza*'s holding that Oregon employers must enforce meal breaks applies before June 2010.

The district court found that "even if *Maza* applies retroactively to the post-June 1, 2010 version of O.A.R. 839-020-0050, [it] does not apply to the named Plaintiffs" because they left JITB's employ before June 2010. *Maza* had two holdings: employers must enforce 30-minute meal breaks (no matter whether and why employees want to return early), and they must pay for shortened meal breaks. *See* 300 Or. App. at 476–77. These two holdings have different bases, so we analyze them separately. The first part of *Maza* applies before June 2010.

At that time, the relevant regulatory text was not changed. *Maza* held that employers had to enforce meal breaks because the regulation "states that every employer *shall provide* a meal period of not less than 30 minutes during which the employee is relieved of all duties." *Id.* at 477 (cleaned up) (quoting Or. Admin. R. 839-020-0050(2)(a)). "In ordinary usage, 'shall' connotes a mandatory duty." *Id.* Even before June 2010, the regulation said employers "shall provide" breaks. *See* Or. Admin. R. 839-020-0050(2)(a) (2009). Thus, it always mandated breaks.

*Maza* also relied on four pieces of regulatory context, but only one of those context clues was changed in 2010.

First, "OAR 839-020-0050(1) states that it 'prescribes' minimum meal periods." 300 Or. App. at 478. The word

"prescribe" suggests the regulation mandates breaks because "[t]o 'prescribe' means . . . 'to lay down a rule : give directions : DICTATE.'" *Id.* (quoting *Webster's Third New Int'l Dictionary* 1792 (unabridged ed. 2002)). Even before June 2010, the regulation used "prescribe" in this way. *See* Or. Admin. R. 839-020-0050(1) (2009).

Second, "OAR 839-020-0050(2)(b) states that, if an employee is not relieved of all duties during 'the meal period,' the employer must pay for the entire 30-minute period." 300 Or. App. at 478. *Maza* reasoned that "[i]f . . . taking a minimum meal period were voluntary, then the obligation to pay wages . . . would apply only when the employer forces the employee to return to work," "[b]ut the rule on its face does not include that limitation." *Id.* This provision, however, was added in June 2010. *See* Or. Admin. R. 839-020-0050 (2009).

Third, the regulation permits some employees to waive their meal breaks in writing. 300 Or. App. at 479. "If . . . a 30-minute meal period must only be made available but may be voluntarily skipped by the employee without consequence for the employer, then there was no need . . . to also require a written waiver of a meal period[.]" *Id.* Even before 2010, the regulation had this provision. *See* Or. Admin. R. 839-020-0050(8) (2009). So even before 2010, it mandated breaks.

Finally, *Maza* thought regulators "intended that meal periods be mandatory" because they are "necessary for the preservation of the health of employees," and "permitting employees to skip [them] . . . would defeat that objective." 300 Or. App. at 479. Even before 2010, the regulation said that meal periods were prescribed for health reasons. *See* Or. Admin. R. 839-020-0050(1) (2009).

Of these four clues, all but the second apply before June 2010.  On balance, the pre-2010 regulatory context suggests that meal breaks are mandatory.

Finally, although *Maza* did not need to defer to the Oregon Bureau of Labor and Industries, it found its holding "consistent with BOLI's interpretation of the rule since at least 2008."  300 Or. App. at 478 n.6.  In 2008, BOLI said it was "not the employee's choice whether or not to take the required breaks."  *Id.*   Rather, "[t]o be in compliance, [employers] must require [their] employee[s] to take all mandated breaks."  *Id.*  BOLI's view confirms that this part of *Maza* applies before June 2010.

### D. Even so, Plaintiffs' claims stall because *Maza*'s holding that employers must pay for shortened meal breaks does not apply before June 2010.

In June 2010, BOLI amended its meal break regulation, adding that "if an employee is not relieved of all duties for 30 continuous minutes during the meal period, the employer must pay the employee for the entire 30-minute meal period."  Or. Admin. R. 839-020-0050(2)(b) (2011).  This was not included before.  *See also* Or. Admin. R. 839-020-0050 (2009).  Unless this new provision is superfluous, the old regulation did not require employers to pay for shortened meal breaks.

Though *Maza* required pay for those shortened breaks, that part of *Maza* relied on regulatory text added after Plaintiffs left JITB.  *Maza* held that, "if an employee is not relieved of all duties for the prescribed minimum 30-minute meal period, OAR 839-020-0050(2)(b) requires that the employer pay the employee's wages for that period of time."

44          GESSELE V. JACK IN THE BOX INC.

300 Or. App. at 478.  But that is the subsection added in 2010.[10]

Other cases confirm that employers did not have to pay for shortened breaks before June 2010.  The Oregon Court of Appeals held that the pre-2010 regulation "requires meal breaks but not *paid* meal breaks."  *Gafur v. Legacy Good Samaritan Hosp. & Med. Ctr.*, 213 Or. App. 343, 348 (2007) (*Gafur I*), *rev'd in part on other grounds*, 344 Or. 525 (2008) (*Gafur II*).  Here, Plaintiffs conceded that "they were paid for all of the time they worked when they were called back to work early[.]"  They were only unpaid during their (shortened) meal breaks.  They can only prevail by obtaining pay for meal breaks, which *Gafur I* precludes.  Indeed, Plaintiffs never try to distinguish *Gafur I*.

At least one Oregon trial court reached the same conclusion.  It denied that "the remedy for failing to provide an uninterrupted 30 minute meal period is to convert an unpaid meal break into a paid 30 minute meal break."  *Liborio v. Del Monte Fresh Produce N.A., Inc.*, No. 0710-11657, 2010 WL 6001799 (Or. Cir. Ct. Sept. 23, 2010).  Instead, "the remedy . . . is recovery of actual time spent" serving the employer "during the meal period."  *Id.*  Plaintiffs request the damages *Liborio* forbids: wages for time spent on an interrupted meal break.  *Gafur I* and *Liborio* both suggest that Oregon courts did not apply § 839-020-0050(2)(b) before June 2010.

---

[10] Plaintiffs also cite *Rother v. Lupenko* for the proposition that "Oregon law . . . entitles employees to receive compensation for breaks of less than thirty minutes[.]"  515 F. App'x 672, 675 (9th Cir. 2013).  But like *Maza*, *Rother* relied on the new part of the regulation.

Plaintiffs argue that, even if Oregon courts did not apply that new rule before 2010, they can exploit the rule because it applies retroactively. We disagree.

"Statutes or regulations which say nothing about retroactive application are not applied retroactively if [doing so] will impair existing rights, create new obligations or impose additional duties with respect to past transactions." *Derenco, Inc. v. Benj. Franklin Fed. Sav. & Loan Ass'n*, 281 Or. 533, 539 n.7 (1978). But Oregon courts apply regulations retroactively when "[t]he explanation of the amended rule . . . shows that the [agency] plainly intended its clarification of the regulation to apply retroactively." *City of Salem v. Noble*, 45 Or. App. 453, 457 (1980). In *Noble*, for example, the agency said that the prior rule "is and has at all times been unnecessary" and that the rule "needs to be eliminated in order that a serious prejudice to the public interest not result[.]" *Id.*

Here, BOLI never said the new rule would run retroactively. Plaintiffs do not argue otherwise. BOLI did say that the new rule "[c]larif[ies] that, for 30 continuous minutes during the meal period must be paid for the entire 30-minute meal period [sic]." *See* 49 Or. Bull. 35 (July 1, 2010), https://records.sos.state.or.us/ORSOSWebDrawer/RecordV iew/1201036. Plaintiffs argue BOLI would not have called this change clarifying unless it was retroactive. We disagree. Unlike the agency in *Noble*, BOLI did not say the prior rule had always been inappropriate, nor did it say the old rule would prejudice anyone. BOLI's explanation falls short of the clear statement *Derenco* and *Noble* demand.

Such a statement was necessary. When an agency says nothing about retroactivity, its rules do not apply

retroactively when they create new obligations. *See Derenco*, 281 Or. at 539 n.7. This rule created a new obligation because, before 2010, employers did not have to pay employees for shortened breaks. Applying this rule retroactively would subject JITB to new liability for past events.

Finally, even if the new rule was not retroactive, Plaintiffs argue that *Buero v. Amazon.com Servs., Inc.*, 61 F.4th 1031 (9th Cir. 2023), supports their claim. *Buero* held that "[t]he Oregon legislature derived the definition of 'employ' from federal law," and that "both jurisdictions define 'employ' in terms of 'work.'" *Id.* at 1046–47. "[T]he parallel definitions of 'employ' support[ed] a narrower construction of 'work time' that mirrors the federal understanding of compensable time." *Id.* at 1047. Here, Plaintiffs assert that federal regulations require employers to pay for shortened meal breaks and conclude that Oregon's regulations must do the same.

That argument fails for two reasons. First, Plaintiffs summarize federal law inaccurately. They cite federal regulations distinguishing "bona fide meal periods" from "rest periods." 29 C.F.R. § 785.19(a). Those regulations require pay for "rest periods." *Id.* § 785.18. But the rest periods that "must be counted as hours worked" "run[] from 5 minutes to about 20 minutes." *Id.* Even if Oregon's meal break regulation imported that test, JITB paid employees for all breaks 20 minutes or less. As a result, Plaintiffs could not claim unpaid wages. Second, *Buero* does not suggest that Oregon's meal break regulation tracks its federal analogue. Oregon's regulation does not define "meal period" at all, so it did not define that term to match federal law. Nor does Oregon's regulation use the same term as the federal regulation: the former refers to "meal periods" but

the latter covers "bona fide meal periods." Oregon's "meal periods" may reach more than those "bona fide meal periods." The two regulations do not align enough for *Buero*'s logic to work here.

Because JITB did not have to pay for shortened meal breaks before June 2010, Plaintiffs are caught in a dilemma. If the proposed class only targets pre-June 2010 violations, its claims fail. Declining to certify that class was harmless error at worst. If the proposed class seeks unpaid wages for post-June 2010 violations, some members might have claims. But because no named Plaintiff worked for JITB after June 2010, their "claims . . . [would not be] typical of the claims . . . of the class," and they could not represent it. Fed. R. Civ. P. 23(a)(3). Plaintiffs also cannot represent the class because, for standing reasons, a plaintiff that "has no . . . claim . . . cannot represent others who may have such a claim, and [their] bid to serve as a class representative must fail." *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). Either way, we affirm.

## VIII. The district court did not err in granting JITB's renewed motion for JMOL on the named Plaintiffs' unpaid break claims.

The named Plaintiffs' individual claims fail for the same reasons as the pre-June 2010 class claims. The district court correctly concluded that "before June 1, 2010, Oregon law did not require employers to pay employees for a 30-minute meal period when employees were called back to work before 30 minutes." JITB employed no named Plaintiff after June 2010.

Plaintiffs respond that, even if JITB did not violate Oregon's meal break regulation, JITB breached its contracts with them. According to Plaintiffs, the district court erred

because it "did not take into account the On-Duty Meal Policy Agreements that [P]laintiffs entered into as part of their employment."

The district court did not err by granting JITB's motion for JMOL without considering the On-Duty Meal Policy Agreements. When opposing JITB's oral motion, Plaintiffs never cited those agreements. Even when opposing JITB's written, renewed motion, Plaintiffs never cited the agreements. "It is well established that an appellate court will not reverse a district court on the basis of a theory that was not raised below." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546 n.15 (9th Cir. 1991). Plaintiffs cannot fault the district court for not analyzing a theory they never brought up.

In fact, Plaintiffs expressly disclaimed that theory. Shortly before trial, Plaintiffs told the district court that they were "not asserting a breach of contract claim for Jack in the Box's failure to comply with its own On-Duty Meal Policy Agreements." The district court had no reason to address, and did not err by ignoring, an expressly disclaimed theory.

Plaintiffs respond that they introduced several On-Duty Meal Policy Agreements at trial. But Plaintiffs told the district court they would offer the agreements to prove that JITB knew it had to pay for shortened meal breaks and thus acted willfully. Because Plaintiffs admitted the agreements for that limited purpose, the district court had no reason to construe the agreements to aid another theory.

Plaintiffs also suggest that their breach of contract theory went to the jury. The district court told the jury that "[i]f a Plaintiff came back to work voluntarily, including through a mistaken belief that they had received a full 30 minutes, there is no violation." Plaintiffs contend this instruction

"exactly matches" the On-Duty Meal Policy Agreements. Even so, the jury instruction never mentioned the agreements. The parties tried the unpaid break claims based on the meal break regulation. Thus, the jury instruction did not put the jury—or the district court—on notice of a theory based on the On-Duty Meal Policy Agreements.

Even if Plaintiffs had not said why they were admitting the agreements, and even if they had a jury instruction on the breach of contract theory, it would change nothing. Plaintiffs still failed to raise that theory in their JMOL oppositions, and they still disclaimed that theory before trial. We affirm.

## IX. The district court erred in granting partial summary judgment to JITB on its affirmative defense that the shoe deductions were for its employees' benefit.

JITB could only deduct the cost of an employee's shoes from their wages if "[t]he deductions [we]re . . . for the employee's benefit[.]" Or. Rev. Stat. § 652.610(3)(b). At summary judgment, the district court "conclude[d] [JITB's] shoe deduction" met this test. Plaintiffs raise a few challenges. Only the last persuades.

Plaintiffs' first challenge lacks merit: deductions may benefit employees without being "traditional employee benefit plans such as health insurance." Plaintiffs cite no authority. Instead, they flout their page limits, incorporating by reference seven pages of briefing given to the district court. That briefing, however, is not convincing. It relies on legislative history describing a previous version of what became § 652.610. In that prior statute, employers could deduct "for medical, surgical or hospital care or service," so

the legislative history focused on health insurance. The present statute dropped that limit and became broader.

The district court was also right that employers may make deductions that do not benefit employees alone. Another part of the statute let employers deduct wages for certain loans "made *solely* for the employee's benefit." Or. Rev. Stat. § 652.610(3)(f)(C) (emphasis added). And a related statute allowed employers to deduct for certain items "furnished . . . for the *private* benefit of the employee." Or. Rev. Stat. § 653.035(1) (emphasis added). Because those limits do not appear here, § 652.610(3)(b) permits some deductions that benefit both employer and employee.

But § 652.610(3)(b) only shields deductions "for the *ultimate* benefit of the employee." *Taylor v. Werner Enters., Inc.*, 329 Or. 461, 470 (1999) (emphasis added). The "ultimate" benefit is the benefit that "ha[s] more importance or more influence over what happens than all others." *Ultimate*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/ultim ate (last visited Nov. 16, 2025); *see Ultimate*, Dictionary.com, https://www.dictionary.com/browse/ultima te (last visited Nov. 16, 2025) ("highest; not subsidiary").

In *Taylor*, for example, the employer deducted wages for a "bond," which it would refund if the employee returned their ID card and there were no claims against the bond. 329 Or. at 463–64. The trial court found the bond was for the employee's benefit, though *Taylor* did not record what the benefit was. *Id.* at 465. Whatever it was, it was not enough. The Oregon Supreme Court reversed, finding the bond was not "for the ultimate benefit of the employee" because "[p]otential liability of an employee to the employer" is "not a reason that supports a lawful deduction." *Id.* at 470. Thus,

whether a deduction is "for the benefit" of an employee turns on the deduction's ultimate reason.

A reasonable jury could find the reason for the shoe deduction was not to benefit Plaintiffs.[11] JITB made employees buy shoes from Shoes for Crews. By choosing Shoes for Crews, JITB made employees pay $2 more per shoe—and got $2 per shoe kicked back from Shoes for Crews. Shoes for Crews also indemnified JITB for the cost of slip-and-fall accidents. A reasonable jury could find that Plaintiffs overpaid for shoes so JITB could collect rebates and indemnities. If so, it could decide the shoe requirement did not ultimately benefit Plaintiffs.

The district court stretched § 652.610(3)(b) to cover that requirement, relying on two facts. At summary judgment, and because JITB bears the burden of proof,[12] those facts did not justify taking this issue from the jury.

First, Plaintiffs could wear their shoes outside work and after their employment ended. Perhaps they got some value for their money. But they might not ultimately benefit. On the shoes' value, all the record reveals is that one other vendor sold non-slip shoes, and it charged $2 less. Nothing suggests the other shoes were lower quality.[13] One could reasonably conclude that Plaintiffs did not benefit because their shoes were worth less than Plaintiffs paid.

---

[11] The district court found JITB had to prove requiring employees to purchase non-slip shoes benefited them, not just that allowing employees to pay by wage deduction benefited them. JITB does not challenge this conclusion, so we assume the district court was right.

[12] The district court found this statute creates an affirmative defense, not an element for Plaintiffs to prove, and no party challenges that.

[13] When JITB compared the shoes, it noted no difference in quality.

Second, the district court found that the employees got some kind of discount on the shoes. The district court cited JITB's summary-judgment brief, but neither the district court nor the brief cited record evidence reflecting any discount. At summary judgment, JITB's say-so does not show that Plaintiffs received a discount. Even if Plaintiffs got a discount, JITB must prove that Plaintiffs benefited from it, and it cites no evidence about the discount. Without more, a jury need not infer that the discount was significant. Also, even if Shoes for Crews charged Plaintiffs less than others, Plaintiffs presented evidence that Shoes for Crews overcharged them. If so, Shoes for Crews overcharged others more, but it still overcharged Plaintiffs.

A reasonable jury could find these two "benefits" were not the ultimate reasons for the shoe deductions. We reverse and remand so a jury can decide whether the shoe requirement was for the employees' benefit.

## X. We remand so the district court can reconsider whether to certify the shoe class in light of our decision.

The shoe class, if certified, would have brought two claims. The result is the same for both claims, but the reasoning varies somewhat.

### A. We remand the § 652.615 shoe class claim because the district court relied on its erroneous finding that JITB had proven the shoe deductions benefitted Plaintiffs.

This claim offers damages if "[a]n employer . . . withhold[s], deduct[s] or divert[s] any portion of an employee's wages[.]" Or. Rev. Stat. § 652.610(3); *see* Or. Rev. Stat. § 652.615. However, the employer has a defense

if "[t]he deductions are . . . authorized in writing by the employee" and "are for the employee's benefit," among other things. Or. Rev. Stat. § 652.610(3)(b).

At first, the district court certified a § 652.615 shoe class, finding that "the interpretation of 'for the employee's benefit' is one that is common among all class members and typical of the Shoe Class." Later, it settled that issue at summary judgment. Once that issue vanished, the remaining issue was whether the workers authorized the deduction in writing. JITB did not keep the written authorizations. Deciding who authorized the deductions would require witness testimony. Some people would remember giving authorization. With that in mind, the district court decertified the class.

Decertification was proper if the shoe claim requires enough individual proof. A district court may maintain a class action only if "the questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3).

Because we reverse on the benefit issue, we remand so the district court may reconsider whether to try this claim class wide. When the district court certified the class, it faced both a common issue (whether the deductions were for the employees' benefit) and an individual issue (whether the employees authorized the deductions in writing). When it decertified the class, only that individual issue remained. Now that the common issue has returned, the district court may certify the class again.

But we do not, as Plaintiffs request, order the class certified.

54                    GESSELE V. JACK IN THE BOX INC.

**B. We remand the § 653.055 shoe class claim because the district court erred in holding that written authorization was a defense to this claim.**

This statute penalizes "[a]ny employer who pays an employee less than the wages to which the employee is entitled under ORS 653.010 to 653.261[.]" Or. Rev. Stat. § 653.055(1). Those statutes require employers to pay "wages computed at a rate [no] lower than" those specified by the state. *Id.* § 653.025(1). They also require employers to pay overtime at no higher than time and a half. *Id.* § 653.261(1)(a). And they define minimum "wages" so employers can deduct certain items from them. *Id.* § 653.010(10). As relevant here, "[e]mployers may deduct from the minimum wage to be paid employees under [the minimum wage and overtime statutes], the fair market value of lodging, meals or other facilities or services furnished by the employer for the private benefit of the employee." *Id.* § 653.035(1). That defense says nothing about written authorization. *See id.*

Elsewhere, Oregon law permits employers to make more deductions, including some "authorized in writing by the employee." *Id.* § 652.610(3)(b). But that statute says nothing about the minimum wage or overtime.

Here, the district court "decertifie[d] . . . the shoe class for employees who had shoe deductions taken that brought them below minimum wage or required overtime because . . . whether employees provided written authorization for shoe deductions requires an individualized inquiry for each employee[.]" This was error. Whether the deductions were authorized in writing affects the § 652.615 claim, but not this one.

JITB counters that its § 652.610(3)(b) written authorization defense applies here.  But the language from that statute does not appear in Or. Rev. Stat. § 653.055, which governs this claim.  JITB responds that the two statutes expressly cross-reference each other.  Not so.  Or. Rev. Stat. § 653.055(1)(b) does permit employees to seek "civil penalties provided in ORS 652.150."  But § 653.055 never cites Or. Rev. Stat. § 652.610 or § 652.615, which spawned Plaintiffs' wrongful deduction claim.  The statute it does cite merely provides penalty wages for willful violations.  Namely, with certain exceptions, "as a penalty for the nonpayment, the wages or compensation of the employee shall continue from the due date thereof at the same hourly rate for eight hours per day until paid or until" the employee sues.  Or. Rev. Stat. § 652.150(1).  That statute does not teleport the (3)(b) defense to wrongful deduction liability into the minimum wage context.

As a result, Plaintiffs want us to certify a class for this claim.  We decline that request and remand.  The district court can decide whether, after our rulings, this claim should proceed individually.

## XI. The district court erred in overriding the jury verdict on Plaintiffs' individual shoe claims.

The last issue controls this one.  The jury found the named Plaintiffs authorized their shoe deductions in writing but awarded them penalty wages pursuant to Or. Rev. Stat. § 653.055 on their shoe claims.  The district court found that "an improper shoe deduction is one that was not authorized in writing" and that the jury "could award penalty wages to named Plaintiffs for minimum wage [or] overtime . . . violations only if they were caused by a . . . improper shoe deduction."  But for this claim, written authorization is no

56 GESSELE V. JACK IN THE BOX INC.

defense. *See supra* Section X.B. Even if JITB could deduct Plaintiffs' wages for the shoes, it could not count the shoes' cost towards the minimum wage and overtime, and Plaintiffs could win their § 653.055 shoe claim.

## CONCLUSION

Beginning with the WBF claims, we reverse the partial summary judgment against JITB and remand for a trial on willfulness. We affirm on the non-penalty wage WBF issues but remand so the district court may recalculate prejudgment interest.

We affirm on the unpaid break claims.

We reverse JITB's victory on the shoe claims. On remand, the district court should (1) reconsider whether to certify a shoe class; (2) retry the shoe claims (on a class or individual basis) to see if the shoes were for the employees' benefit; and (3) retry any other issues consistent with our decision.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Each side shall bear its own costs on appeal.

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

ATHENA,
Leila Barbeau, and Aaron St. Pierre,
*Plaintiffs-Respondents,*

*v.*

PELICAN BREWING COMPANY
and Kiwanda Hospitality Group, LTD.,
*Defendants-Appellants.*

Tillamook County Circuit Court
20CV33103; A179138

Eve L. Miller, Judge.

Argued and submitted July 31, 2024.

Michael T. Garone argued the cause for appellants. Also on the briefs was Schwabe, Williamson & Wyatt, P.C. Also on the reply brief were J. Alexander Bish and Nicholas D. Lauren.

Jon M. Egan argued the cause and filed the brief for respondents.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

HELLMAN, J.

Affirmed and remanded for further proceedings.

174                    Athena v. Pelican Brewing Co.

**HELLMAN, J.**

In this class action wage and hour case, plaintiffs, former hourly employees of defendants, Pelican Brewing Company and Kiwanda Hospitality Group, Ltd., seek compensation for meal periods lasting fewer than 30 minutes. Plaintiffs brought their claim under ORS 653.055, which provides that employers are liable to employees for unpaid wages, and OAR 839-020-0050, an administrative rule of the Commissioner of the Bureau of Labor and Industries (BOLI), which requires employers to "pay" employees for meal periods lasting fewer than 30 minutes. Under ORCP 32 E, the trial court issued an order concluding that the pay owed to an employee for a shortened meal period under OAR 839-020-0050(2)(b) constitutes a wage that plaintiffs have a right of action to recover under ORS 653.055. The trial court also permitted either party to bring an application for an interlocutory appeal of its ORCP 32 E order, as authorized by ORS 19.225, identifying four controlling questions of law: (a) whether the "pay" owed to an employee under OAR 839-020-0050(2)(b) for a meal period lasting fewer than 30 minutes is a penalty or a wage; (b) what is the statute of limitations applicable to such a claim; (c) whether an employer who fails to pay an employee for a shortened meal period may be liable for penalties provided for in ORS 653.055(1)(b); and (d) whether employees have a private right of action for shortened meal periods.

Defendants sought the appeal, and we granted leave under ORS 19.255 for defendants to file the interlocutory appeal. Because the appeal presents novel legal questions, we exercise our discretion to address the merits of each question identified by the trial court.

As we will explain, we conclude that the text, context, and relevant adoption history of OAR 839-020-0050 establish that an employee who receives a shortened meal period has not stopped working for purposes of wage and hour laws. We therefore conclude that the "pay" described in section (2)(b) of that rule refers to a wage, as opposed to a penalty. As a result, if an employer fails to ensure that work is not performed during an otherwise unpaid meal period, that meal period is compensable work time, and thus, the

employer is liable to the employee for a wage for the entire 30-minute meal period. We further conclude that, in enacting the meal period rule, BOLI acted within the scope of its delegated authority under ORS 653.261(1) and ORS 653.040(3) to define work periods during which an employee is owed a wage. Because ORS 653.055 expressly provides that an employer is liable to an employee for "the wages to which the employee is entitled" under ORS 653.261, plaintiffs have a private right of action to recover wages based on shortened meal periods. A wage claim arising under ORS 653.055 is subject to a six-year statute of limitations under ORS 12.080, and an employer may be liable for civil penalties as provided in ORS 653.055(1)(b) and ORS 652.150. Accordingly, we affirm the trial court's ruling and remand for further proceedings.

## I.  BACKGROUND

We begin by describing the underlying legal, factual, and procedural background. ORS 653.261(1)(a) authorizes BOLI to "adopt rules prescribing such minimum conditions of employment *** as may be necessary for the preservation of the health of employees," and those rules may include "minimum meal periods and rest periods." Separately, ORS 653.040 authorizes BOLI to adopt rules "to carry out the purposes of" and "to prevent the circumvention or evasion of" ORS 653.261. Pursuant to those statutory grants of authority, BOLI adopted OAR 839-020-0050, which provides in relevant part:

"(1)  The purpose of this rule is to prescribe minimum meal periods and rest periods for the preservation of the health of employees.

"(2)(a)  Except as otherwise provided in this rule, every employer shall provide to each employee, for each work period of not less than six or more than eight hours, a meal period of not less than 30 continuous minutes during which the employee is relieved of all duties.

"(b)  Except as otherwise provided in this rule, if an employee is not relieved of all duties for 30 continuous minutes during the meal period, the employer must pay the employee for the entire 30-minute meal period."

Thus, the rule requires an employer to provide employees with a minimum unpaid meal period of 30 minutes for each work period between six and eight hours in length. If the employer does not relieve the employee of their duties for 30 continuous minutes, the employer must "pay" the employee for the entire 30-minute period. This appeal presents an important legal question that we have not previously addressed: whether the required "pay" constitutes a wage or a penalty under the statutes.[1]

In the instant case, the facts relevant to the disposition of this interlocutory appeal are not in dispute. The named plaintiffs and the putative class-action plaintiffs are former servers at the Pelican brewpub. Plaintiffs allege that they received meal breaks lasting fewer than 30 minutes and that defendants failed to pay plaintiffs for those meal breaks as required by OAR 839-020-0050(2)(b), resulting "in a consistent net underpayment to plaintiffs and the class members." Plaintiffs brought their suit under ORS 653.055, which provides, in relevant part:

"(1)   Any employer who pays an employee less than the wages to which the employee is entitled under ORS 653.010 to 653.261 or 653.272 is liable to the employee affected:

"(a)   For the full amount of wages, less any amount actually paid to the employee by the employer; and

"(b)   For civil penalties provided in ORS 652.150."

ORS 652.150 provides that an employer who willfully fails to timely pay wages owed to an employee upon termination may be liable to that employee for "penalty wages" of no more than 30-days wages. Plaintiffs conceded below that the reference to ORS 652.150 in ORS 653.055 entitled each plaintiff to a single 30-day penalty for the violation of ORS 653.261 and OAR 839-020-0050. The trial court accepted plaintiffs' concession in its order denying defendants' ORCP 21 motion to dismiss, ordering that plaintiffs "are restricted, as they concede[,] \*\*\* to one 30-day penalty per employee."

---

[1] We note that in *Maza v. Waterford Operations, LLC*, 300 Or App 471, 480, 455 P3d 569 (2019), *rev den*, 366 Or 382 (2020), we characterized the pay due to an employee based on a violation of OAR 839-020-0050 as a wage. However, the legal question as to whether that pay is a wage or a penalty was not before us in that case.

        Pursuant to ORCP 32 E,[2] plaintiffs filed a motion seeking clarification of the penalty structure governing their claims and more specifically, seeking an interpretation of the statutory and regulatory frameworks governing meal periods and wage claims and their interaction with one another. In its ORCP 32 E order, the trial court concluded that "[a] verified claim for *** shortened meal periods are wages, not a penalty[,]" and that "ORS 653.055(1) provides for a remedy and private right of action under OAR 839-020-0050." In the same order, the trial court authorized either party to bring an interlocutory appeal, pursuant to ORS 19.225,[3] identifying four controlling questions of law:

> "(1) Does the amount an employer must 'pay' an employee for a short[ened] meal period under OAR 839-020-0050(2)(b) constitute a penalty or a wage?
>
> "(2) What is/are the statute(s) of limitation applicable to claims based on OAR 839-020-0050(2)(b)?
>
> "(3) Does an employer's failure to pay for a shortened meal period under OAR 839-020-0050(2)(b) entitle the employee to penalty wages under ORS 653.055(1)(b)?

---

[2] ORCP 32 E provides, in relevant part:

"In the conduct of [class] actions to which this rule applies, the court may make appropriate orders which may be altered or amended as may be desirable:

"E(1) Determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument, including precertification determination of a motion made by any party pursuant to Rules 21 or 47 if the court concludes that such determination will promote the fair and efficient adjudication of the controversy and will not cause undue delay; [and]

"* * * * *

"E(5) Dealing with similar procedural matters."

[3] ORS 19.225 provides:

"When a circuit court judge, in making in a class action under ORCP 32 an order not otherwise appealable, is of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the judge shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order to the Court of Appeals if application is made to the court within 10 days after the entry of the order. Application for such an appeal shall not stay proceedings in the circuit court unless the circuit court judge or the Court of Appeals or a judge thereof shall so order."

178                    Athena v. Pelican Brewing Co.

"(4)   Do employees have a private right of action for shortened meal periods?"

We permitted defendants to file the interlocutory appeal, and, because the certified questions pose important and novel legal issues, we exercise our discretion to address all four of the trial court's identified questions.

## II.   DISCUSSION

At the outset, we clarify what is and is not at issue. The parties agree that BOLI has the authority to require employers to provide employees with a continuous 30-minute meal period. However, the parties fundamentally disagree as to how that requirement may be enforced. Defendants argue that ORS 653.261(1) does not "delegate to BOLI the authority to promulgate rules that create wage claims for violations of minimum conditions of employment, such as meal-period entitlements." Even though, under ORS 653.256, BOLI may impose a civil penalty against an employer that fails to provide the full meal period, defendants contend that BOLI "cannot enable employees to sue their employers to recover money for such failures." Thus, in defendant's view, the answer to the trial court's fourth certified question as to whether a private right of action for shortened meal period exists is dispositive. If such an action exists, defendants alternatively argue that OAR 839-020-0050(2)(b), properly construed, entitles employees to a flat 30-minute penalty, as opposed to a wage, for a shortened meal period. That construction in turns supplies the answer to the trial court's other certified questions: an action to recover a penalty must be commenced within three years under ORS 12.100 and plaintiffs may not recover an additional penalty under ORS 653.055(1)(b) for the same misconduct.

Plaintiffs respond that BOLI has not created a private right of action. Rather, in plaintiffs' view, OAR 839-020-0050(2) simply defines a meal break lasting fewer than 30 minutes as compensable work time for which an employee is owed a wage. If an employer fails to pay wages, employees have a legislatively created right of action under ORS 653.055 to recover those wages. Under plaintiffs' framework, such wage claims are subject to a six-year statute of

limitations under ORS 12.080(2), and employees may seek penalty wages under ORS 653.055(1)(b).

Below, we answer the trial court's certified questions in a slightly different order than presented to us. We start with the first question because we must determine the correct interpretation of the rule before we can decide whether the rule exceeds the scope of BOLI's authority. We then answer the trial court's fourth question because it is potentially dispositive; that is, if we agreed with defendant's arguments, there would be no need to reach the second and third questions. However, because as explained below, we do not agree with defendant's arguments, we turn finally to questions two and three.

A.  *Question One: Does the amount an employer must 'pay' an employee for a shortened meal period under OAR 839-020-0050(2)(b) constitute a penalty or a wage?*

In interpreting an administrative rule, "we apply the same general principles applicable to an interpretation of statutes to determine the intention of the administrative agency that adopted the rule, in this case, BOLI." *Maza v. Waterford Operations, LLC*, 300 Or App 471, 476, 455 P3d 569 (2019), *rev den*, 366 Or 382 (2020). Accordingly, "we consider the text of the rule and its context, including other portions of the rule and related laws, and the rule's adoption history." *County of Klamath v. Ricard*, 317 Or App 608, 612, 507 P3d 333 (2022) (internal quotation marks omitted).[4]

---

[4] When interpreting agency rules, "[w]e defer to [an] agency's *plausible* interpretation of its own rule, including an interpretation made in the course of applying the rule, if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law." *Harris v. Dept. of Public Safety Standards*, 287 Or App 111, 115, 400 P3d 1032, *rev den*, 362 Or 94 (2017) (internal quotation marks omitted; emphasis in original). Here, plaintiffs argue that we should defer to BOLI's interpretation of the rule as set forth in a declaration of the Administrator of BOLI's Wage & Hour Division, which was submitted in unrelated class-action litigation in 2011. The declaration provides that BOLI interprets OAR 839-020-0050(2) as requiring employers to pay a wage to employees for shortened meal periods:

"The following example is how BOLI interprets and enforces OAR 839-020-0050(2):

"If the employee begins a meal period of unpaid time by clocking out at 1:00 p.m., but then clocks back in to work (and resumes being paid at an hourly rate) at 1:20 p.m., then unless a specific exception in Section (3) of the

We begin with the relevant text and context of the rule. *Maza*, 300 Or App at 476. OAR 839-020-0050(2)(b) provides that "if an employee is not relieved of all duties for 30 continuous minutes during the meal period, the employer must *pay* the employee for the entire 30-minute meal period." (Emphasis added.) The rule itself does not specify whether the pay owed to an employee is a wage or a penalty. However, "wages" is defined in both ORS chapters 652 and 653, which respectively govern wage claims and employment conditions. ORS 653.010(10) defines "wages" as "compensation due to an employee by reason of employment[.]" Certainly, the "pay" described in the rule falls comfortably within that definition—a shortened meal period can only arise "by reason of employment." Separately, ORS 652.210(14) defines "wages" as "all compensation for performance of service by an employee for an employer[.]" If an employee performs a service for their employer during the 30-minute meal period, that employee has not been completely relieved of their job duties and is then entitled to pay under OAR 839-020-0050(2)(b). Accordingly, although the two statutory definitions of "wages" are not identical, we conclude that both definitions encompass the "pay" described in OAR 839-020-0050(2)(b).

On the other hand, a penalty, though not statutorily defined, is "punitive, not compensatory, in nature." *North Marion Sch. Dist. #15 v. Acstar Ins. Co.*, 343 Or 305, 316, 169 P3d 1224 (2007) (holding that a surety is not liable for penalty wages under ORS 652.150 arising from a contractors' breach of their payment obligations to employees). In the specific context of ORS chapters 652 and 653, penalties result from an employer's willful misconduct. *See* ORS 652.150 (providing for penalty wages where "an employer willfully fails to pay any wages or compensation of any

---

OAR is shown, the employer must pay wages to the employee for the 20 minutes spent clocked out for that short meal period.

"The requirement under the Rule to pay wages would equally apply if in the above example the employee's meal period had been only 15 minutes, or 25 minutes unless the employer shows a specific exception in Section (3)."

We are not aware of any final orders or opinion letters explaining how BOLI interprets the meal break provisions in OAR 839-020-0050(2), nor has either party identified a source other than the 2011 declaration. In light of our interpretation, which ultimately agrees with the interpretation set forth in the declaration, we need not decide whether deference to BOLI is appropriate in these circumstances.

employee"); ORS 653.256 (authorizing BOLI to "assess a civil penalty" against "any person that willfully violates" ORS 653.261). Indeed, we have previously observed that penalty wages under ORS 652.150 function to "protect employees from unscrupulous or careless employers who fail to compensate their employees although they are fully aware of their obligation to do so." *Migis v. Autozone, Inc.*, 282 Or App 774, 802, 387 P3d 381 (2016), *adh'd to on recons*, 286 Or App 357, 396 P3d 309, *rev den*, 362 Or 300 (2017) (citing *State ex rel Nilsen v. Johnston et ux*, 233 Or 103, 108, 377 P2d 331 (1962)). Unlike those statutory penalties, OAR 839-020-0050(2)(b) does not require any specific intent or deliberate conduct on the part of the employer to shorten the meal period, and thus, the "pay" owed to an employee is more akin to a wage. Moreover, that interpretation comports with our decision in *Maza*, in which we concluded that, under OAR 839-020-0050, employers have a "duty to monitor employees' work and meal periods to ensure that full meal periods are taken." *Maza*, 300 Or App at 480. As a result, even if an employee has voluntarily returned to work early contrary to an employee handbook policy, absent an exemption, an employer must "pay" an employee "who is not relieved of duties during the entirety of the required minimum 30-minute meal period." *Id.* For those reasons, we conclude that BOLI intended the "pay" described in OAR 839-020-0050(2)(b) to refer to a wage, rather than a penalty.

Other provisions of OAR 839-020-0050 support that interpretation and demonstrate that BOLI intended to define a shortened meal period as work time during which an employee is owed a wage. First, the rule defines a "work period" as the "period between the time the employee begins work and the time the employee ends work," which excludes the meal period "unless th[at] meal period is *paid work time* as provided in section (2) or (5) of this rule." OAR 839-020-0050(11) (emphasis added). Section (2), at issue in this case, requires an employer to "pay" an employee for a meal period if the employee is not relieved of work duties for a continuous 30 minutes during that meal period. Section (5) provides that an employer who establishes an exemption from the minimum meal break requirement must nevertheless "provide the employee adequate *paid* periods in which to rest, consume

182                     Athena v. Pelican Brewing Co.

a meal, and use the restroom[.]" OAR 839-020-0050(5)(a) (emphasis added).[5] Additionally, an employee may waive their right to a meal period under certain conditions, and if they do, the employee must still be "provided with a reasonable opportunity to consume food during any work period of six hours or more" and the employee must be "paid for any and all meal periods during which the employee is not completely relieved of all duties." OAR 839-020-0050(8)(a)(F) - (G). Within that context, the requirement in OAR 839-020-0050(2)(b) to pay an employee for an otherwise unpaid meal break creates consistency for employees. Regardless of whether the employer is exempted, the employee has validly waived the meal period, or the employer is noncompliant with the rule, a meal period in which the employee is not completely relieved of their duties is part of the "work period" and thus, constitutes "paid work time."

In *Gafur v. Legacy Good Samaritan Hospital*, 344 Or 525, 185 P3d 446 (2008), the Supreme Court similarly concluded that "an employee who takes a rest break does not stop working for wage and hour purposes." *Id.* at 536. In that case, the plaintiffs sought compensation for missed rest periods, arguing that OAR 839-020-0050 entitled them to four hours pay for every three hours and 50 minutes worked. *Id.* at 530. The court "assum[ed] (without deciding)" that BOLI had the authority to create a wage entitlement for such violations but concluded that BOLI did not do so with respect to rest breaks because "the text of the rule, its context, and related statutes demonstrate that 'work' is a term of art for purposes of wage and hour laws, and it includes rest breaks[,]" even though a rest break is not "work" in "colloquial parlance." *Id.* at 532, 534. However, the Supreme Court noted that the rule does not entitle employees to *additional* wages based on missed rest breaks. *Id.* at 538.[6] Consequently, an employee who is not provided a rest

---

[5] An employer that fails to provide employees with a 30-minute meal period must show that doing so would "impose an undue hardship on the operation of the employer's business," that "industry practice or custom has established a paid meal period of less than 30 minutes (but no less than 20 minutes) during which employees are relived of all duty," or that the failure to provide a meal period was a result of "exceptional and unanticipated circumstances." OAR 839-020-0050(3).

[6] We reached a similar conclusion regarding missed meal breaks in *Gafur v. Legacy Good Samaritan Hospital*, 213 Or App 343, 321, 161 P3d 319 (2007),

break during a four-hour shift but is still paid for four hours of work has not been paid "less than the wages to which the employee is entitled" and therefore, "may not pursue a wage claim under ORS 653.055." *Id.* at 536.

In reaching that conclusion, the court reviewed related BOLI regulations concerning working hours, and noted that, even when an employee is not performing their usual job duties, if that time is controlled by the employer such that an employee is unable to use that time for their own purposes, the employee is "working" for purposes of wage and hour laws. *Id.* at 534-35. For example, OAR 839-020-0042 provides that, under certain conditions, an employee who is required to be on duty for less than 24 hours "is considered to be working even though some of the employee's time is spent sleeping or in certain other activities." Similarly, under OAR 839-020-0041(3), an employee who must remain on-call on or close to the employer's premises such that "the employee cannot use the time effectively for the employee's own purposes is working" or is "working while 'on-call.'" In the same vein, with respect to rest periods, "the fact that a 10-minute rest break is too short to enable an employee to use the time effectively for his or her own purposes suggests that the employee is 'working' for purposes of wage and hour laws." *Gafur*, 344 Or at 535.

We conclude that that reasoning applies with equal force to a shortened meal period. Unlike the 10-minute meal period described in OAR 839-020-0050(6)(a), an employer may deduct a full 30-minute meal period from an employee's pay, which suggests that BOLI considered 30 minutes enough time to allow an employee to use the meal period for their own purposes. However, if an employee receives less than a full 30 minutes, the employee does not have the same level of control over that time, and therefore, is still working for wage and hour purposes. Importantly, and consistent with the Supreme Court's decision in *Gafur*, nothing in the

*rev'd on other grounds*, 344 Or 525, 185 P3d 446 (2008), in which we held that the failure to provide the plaintiffs meal breaks during an eight-hour shift did not entitle the employees to wages for eight and one-half hours. The plaintiffs sought review, which the Supreme Court granted, but the plaintiffs did not challenge the portion of our decision regarding the meal period violations, and thus, that matter was not before the Supreme Court. *Gafur*, 344 Or at 528 n 3.

184 Athena v. Pelican Brewing Co.

rule entitles an employee to an *additional* wage for a short-ened meal period, *i.e.*, the employee who takes a 15-minute meal break is not entitled to pay for both the remaining 15 minutes of that break *and* 30 additional minutes. Rather, we simply conclude that an employee who is not relieved of their job duties for a continuous 30 minutes during the meal period is considered "working" for wage and hour purposes.

Finally, our interpretation is reinforced by the rel-evant adoption history. The current language of OAR 839-020-0050(2)(b) was adopted in 2010, two years after *Gafur* issued, to "[c]larify that, except as otherwise provided in [BOLI's] meal and rest periods rule, employees who are not relieved of all duties for 30 continuous minutes during their meal period must be paid for the entire 30-minute meal period." Oregon Bulletin, Volume 49, No. 5, p. 11 (May 2010). Prior to the current rule's adoption, the rule did not expressly require an employer to pay an employee for a shortened meal period; however, the "work period" was still defined as excluding the meal period "unless the meal period is paid work time as provided in Section (2)[.]" OAR 839-020-0050 (Jan 9, 2009). In turn, section (2) of the rule provided that an employee must be relieved of all duties for 30 continuous minutes during shifts of certain lengths. *Id.* The 2010 amendment then did not substantively change the operation of the rule, but rather, specifically articulated, consistent with the Supreme Court's treatment of the rest period in *Gafur*, that an employee who does not receive a full meal period is working for purposes of wage and hour law and is therefore entitled to their wage during that period.

In sum, we conclude that the text, context, and adoption history of OAR 839-020-0050(2)(b) indicate that the rule requires an employer to pay an employee a wage during a shortened meal period because that employee has not stopped working for purposes of wage and hour laws.

B.  *Question Four: Do employees have a private right of action for shortened meal periods?*

Having concluded that OAR 839-020-0050(2)(b) requires employers to pay a wage to employees for a shortened meal period, we turn to the trial court's fourth

certified question, which asks whether employees have a private right of action to recover those wages. Defendants argue that employees do not have a private right of action because BOLI exceeded its statutory authority under ORS 653.261(1) by creating a wage entitlement for meal period violations. Plaintiffs respond that BOLI has not created a "wage entitlement," but rather that BOLI has defined "the hours and circumstances that count as hours worked, *i.e.*, for which workers are owed wages[,]" and thus, plaintiffs have a legislatively created right of action to recover those wages under ORS 653.055.

To start, we note that defendants' argument regarding BOLI's authority is largely premised on their construction of OAR 839-020-0050(2)(b) as entitling an employee to an *additional* 30 minutes of pay beyond their normal wage. However, as we have explained, the rule, properly construed, does not entitle employees to an additional 30 minutes of wages, but rather, provides that an employee who is not completely relieved of their job duties for 30 continuous minutes has not stopped working for purposes of wage and hour laws and, thus, is entitled to their usual wage. The question before us, then, is whether the legislature authorized BOLI to define a shortened meal period as compensable work time. *See Examilotis v. Dept. of State Lands*, 239 Or App 522, 533, 244 P3d 880 (2010) (explaining that "when [an agency's] rule-making power is challenged, [the agency must] show that its regulation falls within a clearly defined statutory grant of authority").

"It is well established that state agencies are creatures of statute, and that, in the absence of a constitutional provision concerning their function and authority, they derive their authority from (1) the enabling legislation that mandates that particular agency's function and grants powers, and (2) from general laws affecting administrative bodies." *City of Portland v. Building Codes Div.*, 313 Or App 93, 101, 496 P3d 1108 (2021) (internal quotation marks omitted). To determine whether BOLI exceeded its statutory authority, we analyze the pertinent enabling statutes using the principles set forth in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

ORS 653.261(1) authorizes BOLI to make rules prescribing minimum conditions of employment, including minimum meal and rest periods:

> "The Commissioner of the Bureau of Labor and Industries may adopt rules prescribing such minimum conditions of employment, excluding minimum wages, in any occupation as may be necessary for the preservation of the health of employees. The rules may include, but are not limited to, minimum meal periods and rest periods, and maximum hours of work, but not less than eight hours per day or 40 hours per workweek; however, after 40 hours of work in one workweek overtime may be paid, but in no case at a rate higher than one and one-half times the regular rate of pay of the employees when computed without benefit of commissions, overrides, spiffs and similar benefits."

By its terms, the statute does not directly entitle employees to wages, nor to any specific working conditions. Rather, ORS 653.261(1) exclusively concerns BOLI's rule-making authority but does not otherwise define "minimum conditions of employment." However, under ORS 653.010(2), to "employ" means "to suffer or permit to work." Although "minimum conditions" is not similarly defined in ORS chapter 653, "minimum" is commonly understood to mean "the least quantity assignable, admissible, or possible in a given case" and a "condition" is an "attendant circumstance[]." *Merriam-Webster Unabridged Dictionary*, https://unabridged. merriam-webster.com/unabridged/minimum (accessed Oct 17, 2025); *id.*, https://unabridged.merriam-webster.com/ unabridged/condition (accessed Oct 17, 2025); *see also State v. Meiser*, 372 Or 438, 462, 551 P3d 349 (2024) ("When the legislature has not specially defined a term of common usage, we generally assume that the legislature intended to use the term in a manner consistent with its plain, natural, and ordinary meaning, and we often consult dictionaries for guidance in determining what the legislature would have understood a term to mean." (Internal quotation marks omitted.)). Thus, the plain text of ORS 653.261(1) authorizes BOLI to set a floor of basic workplace conditions.

That grant of authority is broad, though not unlimited: BOLI may only regulate those working conditions that are "necessary for the preservation of the health of

employees." ORS 653.261(1). Notwithstanding that limitation, ORS 653.261(1) contemplates that some minimum conditions may relate to an employee's wage. First, the statute expressly prohibits BOLI from establishing a minimum wage, which is governed by ORS 653.025, and its exclusion suggests that a minimum wage might otherwise be considered a minimum condition of employment. Second, the statute defines overtime and sets the applicable rate of pay. Significantly, the legislature identified overtime pay alongside meal and rest periods and maximum hours of work as "minimum conditions of employment" within BOLI's rulemaking authority. We note that each of those conditions concerns an employee's working hours and may affect the computation of an employee's wages—overtime pay is triggered only once an employee has worked a maximum number of hours, and in turn, whether required rest or meal breaks are included in those hours similarly impacts the wage and hour computation. Moreover, the statute itself does not instruct whether a minimum meal or rest period is paid or unpaid, which suggests that the legislature intended that BOLI could determine whether such breaks constitute work time. In sum, although the plain text of ORS 653.261(1) does not explicitly authorize BOLI to define meal periods as compensable work time, the statutory text demonstrates that certain minimum conditions necessary to protect employee health affect an employee's working hours and wages.

In addition to ORS 653.261(1), the legislature granted BOLI general rulemaking authority under ORS 653.040:

> "The Commissioner of the Bureau of Labor and Industries, in addition to the commissioner's other powers, may:
>
> "*****
>
> "(3)  Make such rules as the commissioner considers appropriate to carry out the purposes of ORS 653.010 to 653.261, or necessary to prevent the circumvention or evasion of ORS 653.010 to 653.261 and to establish and safeguard the minimum wage rates provided for under ORS 653.010 to 653.261."

Defendants argue that ORS 653.040 is inapposite because ORS 653.261 is a more specific statutory provision that takes precedence over the general grant of authority contained in ORS 653.040. It is true that we generally "assume that the more specific of *conflicting* statutes will take precedence over a more general one[,]" however, that maxim of construction is not applicable unless the statutes are "irreconcilably conflicting." *Preble v. Centennial School Dist. No. 287*, 298 Or App 357, 364, 367, 447 P3d 42 (2019) (emphasis added).

We find no such conflict, let alone an irreconcilable one, between ORS 653.261 and ORS 653.040. To start, ORS 653.040 grants BOLI rulemaking authority *in addition* to its other powers, which suggests that the legislature intended ORS 653.040 to supplement more specific grants of authority within ORS chapter 653. Further, ORS 653.040 expressly references ORS 653.261, thereby authorizing BOLI to promulgate rules to "carry out the purposes of" and "prevent the circumvention" of ORS 653.261. Put another way, ORS 653.040(3) authorizes BOLI to create "policies that implement its statutory authority," although that "does not include the authority to issue rules that expand or neglect those responsibilities." *Examilotis*, 239 Or App at 533 (discussing the Department of State Lands' statutory authority under ORS 196.692(1) to "carry out the provisions" of various statutes). ORS 653.261 expressly contemplates meal periods may be necessary to preserve the health of employees, and OAR 839-020-0050 implements that statutory policy by requiring that an employee be completely relieved of their job duties during the meal period and by placing the burden of enforcement on the employer because of "their authority over the workplace" and "unique role in monitoring the workplace to ensure that work is not performed when it is not requested and that breaks are taken." *Maza*, 300 Or App at 479-80. If an employer fails to ensure that work is not performed during an unpaid meal period, OAR 839-020-0050(2)(b) simply provides that that meal period is compensable work time. We find that enforcement scheme falls within BOLI's authority to require meal breaks for employee health and to prevent employers from circumventing that requirement.

Additionally, ORS 653.055 provides contextual support for that conclusion. *See State v. Giron-Cortez*, 372 Or 729, 737, 557 P3d 505 (2024) ("A statute's context includes other provisions of the same or related statutes."). ORS 653.055 creates a private right of action to recover "the wages to which the employee is entitled under ORS 653.010 to 653.261." Both ORS 653.261(1) and ORS 653.040(3) fall within that statutory range, and both statutes exclusively concern BOLI's rulemaking authority. By referencing BOLI's enabling statutes within the statute governing wage claims, the legislature likely intended that such a wage claim could arise based on a violation of BOLI rules. Because certain minimum conditions of employment, such as the meal period, are intertwined with an employee's working hours and the performance of their job duties, BOLI has authority to define a meal period as compensable work time.[7]

In conclusion, OAR 839-020-0050(2)(b) does not exceed BOLI's statutory authority to make rules prescribing minimum meal periods to protect employee health. The text, context, and legislative history of ORS 653.261(1) and ORS 653.040(3) demonstrate that the legislature understood that some minimum conditions of employment relate to an employee's working hours and wages and that it granted BOLI the authority to regulate those conditions. Accordingly, an employer who fails to pay an employee wages owed for a shortened meal period has paid the employee "less than the wages to which the employee is entitled" and the employee has a private right of action to recover those wages under ORS 653.055.

---

[7] We also reviewed the legislative history of ORS 653.261 and did not find support for defendants' position. Defendants emphasize that prior to the enactment of ORS 653.261, BOLI had the authority to set the minimum wage for women and minors. Or Laws 1933, ch 88, § 1. That authority was revoked in 1967 when the state passed House Bill (HB) 1340, which established the state's first statutory minimum wage. Or Laws 1967, ch 596, §§ 4-5. Defendants argue that that historical context is evidence that the legislature knew how to expressly grant BOLI the authority to create a wage entitlement, and by removing BOLI's authority to set the minimum wage, it necessarily prohibited BOLI from granting employees "additional wages in connection with working conditions." However, defendants' argument is grounded in a construction of the rule we have already rejected. Moreover, the requirement that an employer pay an employee for performing job duties during a meal break does not modify the minimum wage, it only regulates when an employee is entitled to that wage.

C. *Question Two: What is/are the statute(s) of limitation applicable to claims based on OAR 839-020-0050(2)(b)?*

We turn next to the trial court's second certified question, which asks what statute of limitations governs plaintiffs' claims. An action for unpaid wages must be commenced within six years. ORS 12.080 ("An action upon a liability created by statute, other than a penalty or forfeiture, excepting those mentioned in ORS 12.110 *** shall be commenced within six years."). Actions for a penalty must be commenced within three years, ORS 12.100, and actions for overtime pay and associated penalties must be commenced within two years, ORS 12.110(3). Consequently, we agree with the parties that the applicable statute of limitations depends on whether an employer must pay employees a wage or penalty for a violation of OAR 839-020-0050(2)(b). Because we conclude that an employer must pay an employee wages for a meal period lasting fewer than 30 minutes, an action to recover those unpaid wages is subject to a six-year statute of limitations under ORS 12.080.

D. *Question Three: Does an employer's failure to pay for a shortened meal period under OAR 839-020-0050(2)(b) entitle the employee to penalty wages under ORS 653.055(1)(b)?*

We turn to trial court's third certified question, which asks whether an employee who is not paid for a shortened meal period is entitled to penalty wages under ORS 653.055(1)(b) and ORS 652.150. As with the applicable statute of limitations, the parties agree, as do we, that the answer to this question depends on whether the "pay" described in OAR 839-020-0050(2)(b) is a wage or penalty. Because that pay is a wage, we conclude that an employer may be liable for penalty wages under ORS 652.150 based on willful violations of the meal break rule.

As a reminder, ORS 653.055(1) provides that an employer "who pays an employee less than the wages to which the employee is entitled under ORS *** 653.261" is liable to the employee for the "full amount of the wages" and "[f]or civil penalties provided in ORS 652.150." In turn, ORS 652.150 provides, as relevant:

"(1)   * * * [I]f an employer willfully fails to pay any wages or compensation of any employee whose employment ceases, as provided in ORS 652.140 and 652.145, then, as a penalty for the nonpayment, the wages or compensation of the employee shall continue from the due date thereof at the same hourly rate for eight hours per day until paid or until action therefor is commenced. However:

"(a)   In no case shall the penalty wages or compensation continue for more than 30 days from the due date[.]"

Although ORS 652.150 concerns wages due upon an employee's termination, we have previously concluded that the reference to ORS 652.150 in ORS 653.055 provides for penalty wages not only for untimely payment of wages upon termination, but also for distinct statutory violations of ORS 653.261. *Cornier v. Paul Tulacz, DVM PC*, 176 Or App 245, 249, 30 P3d 1210 (2001). However, as we have previously concluded, "the reference to ORS 652.150 in ORS 653.055(1) includes the need to establish that an employer's failure to pay wages is willful in order to impose civil penalties." *Migis*, 282 Or App at 803. Thus, an employee may seek penalty wages based on an employer's willful failure to pay wages to which the employee is entitled under ORS 653.261, which, as we have explained, includes wages owed for a shortened meal period.[8]

### III.   CONCLUSION

In conclusion, under OAR 839-020-0050(2), an employee who is not completely relieved of their job duties during a mandatory 30-minute meal period is entitled to a

---

[8] Defendants acknowledge that plaintiffs "are bound" by their concession "that they are entitled to one 30-day penalty per plaintiff." However, defendants argue that "future plaintiffs bringing similar claims may argue that * * * the number of penalties is based on the number of pay periods in which the employee was not paid wages." Because plaintiffs seek only one 30-day penalty per plaintiff, we express no opinion as to whether ORS 653.055 and ORS 652.150 permit an employee to seek a 30-day penalty for each pay period in which an employer fails to pay for shortened meal periods. *See Shea v. Chicago Pneumatic Tool Co.*, 164 Or App 198, 204, 990 P2d 912 (1999), *rev den*, 330 Or 252 (2000) ("[I]t makes sense that the legislature would intend to limit interlocutory appellate review to those questions identified by the trial court as 'controlling' and as to which an immediate decision 'may materially advance the ultimate termination' of the lawsuit. To permit interlocutory appellate review broader than the controlling questions identified by the trial court risks wasting the time of the appellate courts in disposing of issues that, by the disposition of the case at trial, may ultimately be rendered academic.").

wage for the entire 30-minute period because that employee has not stopped working for purposes of wage and hour laws. That rule does not exceed the scope of BOLI's statutory authority to prescribe minimum meal periods. Based on the text, context, and legislative history of the pertinent enabling statutes, ORS 653.261(1) and ORS 653.040(3), we conclude that the legislature authorized BOLI to regulate an employee's working hours as those hours interact with required meal and rest periods. Accordingly, employees may recover unpaid wages based on a violation of OAR 839-020-0050(2) under ORS 653.055. Such a claim must be commenced within six years, ORS 12.080, and an employer may be liable for penalty wages under ORS 653.055(1)(b) and ORS 652.150 if they willfully violate ORS 653.261.

Affirmed and remanded for further proceedings.